# United States Court of Appeals
## For the First Circuit

No. 18-1897

UNITED STATES OF AMERICA,

Appellee,

v.

ORISTEL SOTO-PEGUERO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Thompson, Kayatta, and Barron,
Circuit Judges.

Jane Elizabeth Lee for appellant.
Theodore B. Heinrich, Assistant United States Attorney, with
whom Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

October 19, 2020

**BARRON**, **Circuit Judge**.  In April 2018, Oristel Soto-Peguero was convicted in the District of Massachusetts on three counts related to distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and § 846 and one count of discharging a firearm in furtherance of a drug crime in violation of 18 U.S.C. § 924(c). The District Court sentenced him to twenty-two years in prison. Soto-Peguero now argues on appeal that the District Court erred in denying his motion to suppress certain evidence at trial. He also asserts that the District Court should not have concluded that he was eligible for a two-level role enhancement under the United States Sentencing Guidelines.  He thus asks us to vacate his convictions and resulting sentence.  We **affirm**.

## I.

We begin by summarizing the facts in the record, viewing them in the light most favorable to the suppression ruling. See United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).  In January 2015, a Task Force consisting of agents from the federal Drug Enforcement Agency ("DEA") and officers from several Massachusetts law enforcement agencies were engaged in an investigation of potential heroin suppliers in Taunton, Massachusetts.[1]  Pursuant to that joint investigation, between

---

[1] We note that this investigation also led to the indictment of Luis Guzman-Ortiz, whom a separate jury found guilty of conspiring with Soto-Peguero to distribute heroin. Guzman-Ortiz successfully filed a motion for acquittal on that charge pursuant

January and July 2015, Task Force members used a series of wiretaps to investigate Eddyberto Mejia-Ramos, a suspected local trafficker.

The wiretaps intercepted a number of conversations between Mejia-Ramos and Soto-Peguero, which indicated that Soto-Peguero was supplying Mejia-Ramos with heroin. Members of the Task Force suspected that Soto-Peguero's girlfriend, Mercedes Cabral, sometimes transported the drugs to Mejia-Ramos.

On the afternoon of July 6, 2015, Task Force members intercepted conversations that indicated that Soto-Peguero would deliver drugs to Mejia-Ramos's home later that day. Specifically, just before 9 p.m., Mejia-Ramos called Soto-Peguero and asked him to come at 10 p.m. and "bring something heavy." Soto-Peguero said in response that he would "send the woman." Then, at 9:38 p.m., he called Mejia-Ramos to let him know "the woman is on her way."

Four minutes earlier, Cabral had left the apartment that she shared with Soto-Peguero. Several Task Force members followed her as she drove in the direction of Mejia-Ramos's home. They then enlisted two Massachusetts State Police troopers to conduct a traffic stop. The troopers pulled Cabral over and determined that she was driving on a suspended license. In the process of

to Federal Rule of Criminal Procedure 29. For our opinion affirming the District Court's grant of the Rule 29 motion, see United States v. Guzman-Ortiz, ___ F.3d ___, 2020 WL 5542135 (1st Cir. 2020) [No. 19-1349].

- 3 -

arresting her, they discovered close to a kilogram of heroin in her pocketbook.

After Cabral's arrest, Special Agent Carl Rideout, the DEA agent in charge of the Task Force, directed one of its members to "freeze" Cabral and Soto-Peguero's residence in order to secure it while he obtained a search warrant. Task Force members surrounded the apartment. As they tried to gain entry, someone fired a gun from inside the apartment out the front door. Task Force members then managed to enter the premises, without a warrant, and, while there, found substantial evidence of heroin possession and trafficking.

The following day, Special Agent Rideout applied for a search warrant for Soto-Peguero's apartment. The affidavit supporting the search warrant stated that during a "security sweep" of the apartment, "officers observed in plain view two large brick shaped objects believed to be kilograms of heroin, one in each bedroom." Additionally, the affidavit stated, a Task Force member "moved one of the bricks" and "observed a firearm beneath it." The Magistrate Judge granted the warrant application.

Task Force members thereafter executed that search warrant. In doing so, they discovered additional heroin and other evidence of drug trafficking.

On March 23, 2016, a grand jury in the United States District Court for the District of Massachusetts issued a

superseding eight-count indictment.  Soto-Peguero was not named in Counts One or Four,[2] but he was charged with six counts:  possession with intent to distribute 100 grams of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i) (Count Two); possession with intent to distribute one kilogram of heroin in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(i) (Count Three); two counts of conspiring to distribute and possess heroin in violation of 21 U.S.C. § 846 (Counts Five and Six); illegally possessing a firearm in violation of 18 U.S.C. § 922(g)(1) (Count Seven); and using a firearm during and in relation to a drug offense in violation of 18 U.S.C. § 924(c) (Count Eight).

Soto-Peguero moved pursuant to the Fourth Amendment of the United States Constitution to suppress, among other things, the evidence that law enforcement had found at his apartment, including both the drugs and gun discovered without a warrant on the night Task Force members first entered his home, and the further evidence that law enforcement uncovered pursuant to the warrant that was later issued.  He contended that, as to the first batch of evidence, "[n]o exigency justified the police's forced entry" because even if the Task Force had waited to obtain a warrant, there would have been no "great likelihood that evidence

---

[2] Count One was brought against Cabral and Count Four was brought against Guzman-Ortiz, who was arrested at the same time as Soto-Peguero.

would [have] be[en] destroyed." He also asserted that even if the initial entry had been permissible, "the officers' subsequent decision to search under the auspices of conducting a 'protective sweep' [was] unsustainable" because "they had no basis to suspect another person, let alone a dangerous person, was present." In addition, Soto-Peguero challenged the contention that the drugs and gun the Task Force recovered during the warrantless entry were in "plain view" when law enforcement arrived.

Soto-Peguero separately argued that the search warrant itself was "defective" because it was "based on evidence that was illegally obtained" during the course of the warrantless entry into the apartment. He thus contended that the evidence the Task Force found after obtaining that warrant had to be suppressed pursuant to the Fourth Amendment as well.

In reply, the United States argued that exigent circumstances were present at the time of the initial entry into the apartment because "[i]t was not unreasonable for DEA officers to fear that Soto-Peguero might conclude that Cabral had been arrested when Cabral did not arrive in Taunton, did not return home, and was unable to communicate with Soto-Peguero." The government also argued that Soto-Peguero "created a distinct exigency" when he fired a shot through the front door. Moreover, the government contended that the scope of the protective sweep was necessary because "having been fired at, the officers were

entitled to account for the presence and location of the firearm to ensure safety" and pointed out that Task Force members had "testified [at the grand jury] that the heroin package in the front bedroom was in plain view."

Finally, the government contended that, even if the Task Force members' conduct exceeded that of an appropriate protective sweep, the exclusionary rule should not apply. The government argued there was "no doubt but that agents would have sought and obtained [a warrant] whether or not they observed the kilograms of heroin in [the] apartment during the sweep," and therefore that the evidence "inevitably would have been revealed in some other lawful way." For that proposition, the government relied on the inevitable discovery doctrine, which provides that evidence obtained in violation of the Fourth Amendment is admissible "if it ineluctably would have been revealed in some other (lawful) way, so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." United States v. Zapata, 18 F.3d 971, 978 (1st Cir. 1994) (internal citations omitted).

Soto-Peguero responded in a separate memorandum, arguing, among other things, that applying the inevitable discovery doctrine in this case would, in fact, "sully the

prophylaxis of the Fourth Amendment."  He contended that admitting the evidence would incentivize police misconduct because it would "assure[] police that they need not wait for a magistrate's approval."  He argued that this is "what happened here" because the officers "had little concern about prematurely prying open a heating vent and rifling through a closed nightstand" since they were confident a warrant would later issue.

The District Court held a hearing on Soto-Peguero's motion to suppress and heard testimony from both Soto-Peguero and Task Force members who were involved in the warrantless entry and the execution of the search warrant.  The focus of that evidentiary hearing was on the Task Force members' and the defendant's conflicting accounts regarding what transpired during the warrantless entry of Soto-Peguero's home.  There were three salient points of disagreement:  whether the heroin that law enforcement found in the front bedroom during the initial entry into the apartment had been in plain view or was concealed by the cover of an air vent; whether the heroin found in a black plastic bag in the rear bedroom that same night had been between the bed and the nightstand or in a drawer of the nightstand; and whether Special Agent Meletis, of the DEA, looked inside the black plastic bag during the warrantless entry, as he testified in the suppression hearing, or only the next day after having obtained the search warrant, as he testified before the grand jury in March of 2016.

- 8 -

Soto-Peguero also testified at the hearing that, while he was detained on the first floor of his apartment, it sounded "[l]ike they were breaking stuff" upstairs and that his bed frame had been intact prior to the search.

Soto-Peguero and the United States then both filed post-hearing briefs. As relevant here, in addition to renewing the objections from his motion to suppress, Soto-Peguero elaborated on his assertion that the District Court "should not excuse the officers' misconduct by applying the inevitable discovery rule." In support of that contention, he pointed to what he characterized as "[t]he fact that at least one officer testified inconsistently about the scope of his search -- denying and then admitting that he looked inside a black bag" and to what he contended was the fact that the "officers[] unreasonabl[y] delay[ed] in seeking the search warrant" because "they anticipated entering his home that day," but "rather than bothering to apply for judicial authorization, they sent more than ten officers to prepare to 'secure' the apartment without a warrant."

In its post-hearing filing, the United States contended that the inevitable discovery doctrine's requirements were met. First, the government repeated its contention that "there can be no doubt but that agents would have sought and obtained [a search warrant] whether or not they observed the kilograms of heroin in [the] apartment during the sweep." The United States also

- 9 -

reiterated that there was "no reason to discredit the testimony of the officers" who averred that the heroin in the front bedroom was in plain view. The government then further contended -- in an argument that appeared to invoke the distinct exception to the exclusionary rule known as the independent source doctrine, see Murray v. United States, 487 U.S. 533, 537 (1988) -- that even "if the discovery of the heroin and firearm [were] excised from the affidavit in support of the search warrant, there [was] still overwhelming probable cause to justify the issuance of the warrant."

The District Court denied Soto-Peguero's motion to suppress. United States v. Soto-Peguero, 252 F. Supp. 3d 1, 14 (D. Mass. 2017). First, the District Court found that exigent circumstances justified the initial warrantless entry. Id. at 11-12. The District Court concluded that if Cabral had failed to return in a timely manner, and if Soto-Peguero had been unable to reach her, he might have concluded that law enforcement was "closing in" on him. Id.

The District Court also found that it was reasonable for the Task Force members to delay in obtaining the warrant, even if they had probable cause to search the apartment before Cabral departed with some of the drugs. Id. at 12. Under Supreme Court precedent, the District Court reasoned, there are "many entirely proper reasons why police may not want to seek a search warrant as

soon as the bare minimum of evidence needed to establish probable cause is acquired."  Id. (quoting Kentucky v. King, 563 U.S. 452, 466-67 (2011)).  And, the District Court further determined, the fact that "police might have foreseen the eventual entry" was not enough on its own to "prevent application of the exigent circumstances doctrine."  Id. (quoting United States v. Samboy, 433 F.3d 154, 160 (1st Cir. 2005)).

The District Court next explained, however, that it was "not persuaded by the officers' account that a block of heroin was sticking out of a floor vent."  Id. at 13.  The District Court also declined to "resolve the conflicting evidence as to whether a bag in the back bedroom containing heroin was in a drawer or next to the bed."  Id.  "[E]ven accepting the government's version of events as true," the court held that "manipulating an object in a vent and opening a bag goes beyond the scope of a protective sweep."  Id.

Nevertheless, the District Court denied Soto-Peguero's motion to suppress under the inevitable discovery exception to the exclusionary rule.  The District Court concluded that, even if the Task Force members had not found the heroin or the gun in their warrantless search of Soto-Peguero's home, they would have found that evidence after obtaining a search warrant.  The District Court credited Special Agent Rideout's testimony that he would have pursued a warrant even if no evidence had been uncovered during

- 11 -

the "protective sweep." Id. And the District Court concluded that the Task Force had probable cause to support a warrant for such a search even before a single member entered the apartment. Id. Therefore, according to the District Court, the government had "demonstrate[d], to a high degree of probability," that the evidence inevitably would have been discovered. Id. (alteration in original) (quoting United States v. Almeida, 434 F.3d 25, 29 (1st Cir. 2006)).

The District Court did express disapproval of the fact that Task Force members looked inside the vent and the bag. But, it went on to conclude that admitting the evidence was "unlikely to 'erode [Fourth Amendment] protections or encourage police misconduct.'" Id. at 14 (alteration in original) (quoting Almeida, 434 F.3d at 29). Thus, it determined that admitting the evidence would not "sully the prophylaxis of the Fourth Amendment" and therefore "the deterrence rationale [did] not justify putting the police in a worse position than they would have been had no misconduct occurred." Id. at 13-14 (first quoting Zapata, 18 F.3d at 978; then quoting United States v. Silvestri, 787 F.2d 736, 740 (1st Cir. 1986)). The District Court therefore denied Soto-Peguero's suppression motion.

The case proceeded to trial, which lasted six days. On April 2, 2018, the jury convicted Soto-Peguero on Counts Two,

Three, Five, and Eight of the indictment, but acquitted him on Count Six (conspiring with Guzman-Ortiz).[3]

For the purposes of calculating Soto-Peguero's sentencing range under the Guidelines, the Presentence Investigation Report ("PSR") that the United States Office of Probation prepared grouped the first three counts of conviction (Counts Two, Three, and Five) separately from the firearm conviction (Count Eight). The PSR determined that, based on the quantity of heroin discovered, Soto-Peguero's base offense level should be set at 32 for the three grouped charges. The PSR also applied a two-level role enhancement under § 3B1.1(c) of the Guidelines, because Soto-Peguero "directed his significant other at the time, Mercedes Cabral, to deliver drugs for him on at least four separate occasions."

Soto-Peguero objected to the role enhancement both in his sentencing memorandum and at the sentencing hearing. The United States argued that Cabral was "clearly directed by Mr. Soto-Peguero" and that it was "very plain that Mr. Soto-Peguero was supervising" her activities. The District Court agreed that Soto-Peguero was "much more the head of the enterprise" than Cabral was and upheld the role enhancement accordingly.

---

[3] Count Seven was dismissed prior to trial.

- 13 -

Including the role enhancement, and accounting for the extent of Soto-Peguero's criminal record, the mandatory 10-year prison sentence for his firearm charge, and his history of mental health struggles and childhood abuse, the District Court sentenced him to a total term of incarceration of 264 months with a five-year term of supervised release and a $400 special assessment.

The District Court entered judgment on September 12, 2018. On September 18, 2018, Soto-Peguero filed a timely notice of appeal. We have jurisdiction over his appeal from his conviction under 28 U.S.C. § 1291. We have jurisdiction over his appeal from his sentence under 18 U.S.C. § 3742(a).

## II.

When a district court denies a motion to suppress, we review the legal questions de novo and evaluate the factfinding for clear error. United States v. Ackies, 918 F.3d 190, 197 (1st Cir. 2019).

## A.

Soto-Peguero first asserts that the Fourth Amendment requires suppression of both the evidence the Task Force found the night of the warrantless entry and the evidence uncovered the following day pursuant to the search warrant. He contends that "[t]here was no information [in the warrant application], aside from the illegally obtained evidence, supporting a finding that enumerated evidence of contraband or of a crime would be found" at

- 14 -

his home.  Failing that, he argues that, at the very least, the "closeness" of the question of whether probable cause existed without the illegally obtained evidence "makes it impossible to conclude . . . that the Magistrate's decision to issue the warrant was unaffected by the illegal evidence."

But, Soto-Peguero's focus on the warrant application is misplaced.  The District Court held that the evidence at issue -- both the evidence discovered during the warrantless entry and the evidence found the following day -- is admissible under the inevitable discovery doctrine.  Under that exception to the exclusionary rule, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received."  Nix v. Williams, 467 U.S. 431, 444 (1984).  In this case, that means the government must establish that, had there been no search in violation of the Fourth Amendment, the officers inevitably would have applied for a warrant, obtained it, and discovered the evidence in question when executing that warrant.  See United States v. Procopio, 88 F.3d 21, 27 (1st Cir. 1996) (applying the inevitable discovery doctrine to admit the illegally uncovered contents of a briefcase where there was "little reason to doubt that the local police would have contacted federal agents, even without the information gleaned during the search," and where it was "even more certain that

federal agents . . . would have then sought a warrant to search the briefcase").  Thus, because the Task Force members need not have actually obtained a warrant to rely on the inevitable discovery exception, any defects in the warrant that they did obtain the day after their initial warrantless entry of Soto-Peguero's apartment are not directly relevant to the question of whether the evidence at issue must be suppressed.  See Silvestri, 787 F.2d at 744 (contemplating situations where a warrantless search is never followed by a warrant and yet the government relies on the inevitable discovery doctrine).

Moreover, here, the United States has made the required showing under the inevitable discovery doctrine.  In that regard, Soto-Peguero does not challenge Special Agent Rideout's testimony that he would have pursued a warrant regardless of what was found in securing the apartment.  He also does not argue that, if the Task Force members had delayed entry until they obtained a valid search warrant, they would not have found the evidence in question upon its execution.

To the extent that we can read Soto-Peguero's claim that the warrant application would have been insufficient without the illegally obtained evidence as an argument that the police did not have probable cause to search his home before they entered it, we disagree.  Soto-Peguero and Cabral lived together at the searched location; he spoke to Mejia-Ramos on July 6, indicating that he

- 16 -

would deliver heroin that day; he told Mejia-Ramos that Cabral was on her way around 9:38 p.m., four minutes after she had left their apartment; and Cabral was then stopped with close to a kilogram of heroin in her pocketbook. We thus agree with the District Court that "the officers had sufficient probable cause" to substantiate a search warrant for Soto-Peguero's apartment before the protective sweep even began. Soto-Peguero, 252 F. Supp. 3d at 13.

## B.

Soto-Peguero separately argues that the District Court erred in insulating the evidence at issue from the exclusionary rule by adverting to our precedent that, in analyzing whether to admit evidence through the inevitable discovery doctrine, we must also consider whether doing so would "encourage police misconduct" and thereby "sully the prophylaxis of the Fourth Amendment." United States v. Hughes, 640 F.3d 428, 440-41 (1st Cir. 2011) (quoting Zapata, 18 F.3d at 978). In undertaking that inquiry, we need to "dwell[] closely on the facts" and look toward whether the record establishes that law enforcement officers intentionally violated the Fourth Amendment as well as the incentives, if any, for them to act unconstitutionally. United States v. Scott, 270 F.3d 30, 45 (1st Cir. 2001); see also Hughes, 640 F.3d at 441. But, rather than develop an argument along those precise lines, Soto-Peguero instead directs our attention to an out-of-circuit case, United States v. Madrid, 152 F.3d 1034 (8th Cir. 1998).

- 17 -

There, the Eighth Circuit recognized an exception to the inevitable discovery doctrine because police behaved egregiously and "exploited their presence" in the defendant's home. Id. at 1040. Either way, Soto-Peguero's attempt to make the case that the conduct by law enforcement here precludes us from affirming the District Court's inevitable discovery ruling fails.

Invoking Madrid, Soto-Peguero cites to a number of instances of purported misconduct that he argues necessitate suppression even if the inevitable discovery exception otherwise would apply. Specifically, he alleges that the Task Force members "tore the residence apart," "destroy[ed] furniture," "open[ed] drawers," "open[ed] containers," "pr[ied] the lid off [an] air conditioning vent," and "used this illegally obtained evidence to secure the warrant" during their first entry to his apartment. He also contends that admitting this evidence would "make[] the court complicit in the officers' false testimony at the suppression hearing."

Soto-Peguero makes the allegation that Task Force members "tore the residence apart" and "destroy[ed] furniture" in support of his Madrid-based argument for the first time on appeal. Thus, our review of it is at most for plain error. See United States v. Lara, 970 F.3d 68, 76 (1st Cir. 2020). We find none, as the District Court was not asked to make a finding about what, if any, damage the Task Force members caused in going through the

- 18 -

apartment during their initial entry and the District Court did not do so on its own.  See United States v. Takesian, 945 F.3d 553, 563 (1st Cir. 2019) (explaining that "if an error pressed by the appellant turns on 'a factual finding [he] neglected to ask the district court to make, the error cannot be clear or obvious unless' he shows that 'the desired factual finding is the only one rationally supported by the record below'" (quoting United States v. Olivier-Diaz, 13 F.3d 1, 5 (1st Cir. 1993))).

We turn, then, to the aspects of Soto-Peguero's Madrid-based argument that rely on the remaining allegations of misconduct.  In part, Soto-Peguero relies on the assertion that the record evidence indicates that Task Force members opened the drawer of the nightstand and looked inside the floor vent when they went through the apartment without a warrant.  But, even accepting that the evidence supports that understanding of their conduct, it still "falls short of the blatant search through personal effects in Madrid," just as we concluded the last time that a criminal defendant asked us to follow the Eighth Circuit's lead.  United States v. Dent, 867 F.3d 37, 41 (1st Cir. 2017); see id. (holding that when an officer exceeded the scope of a protective sweep by looking under an air mattress, that did not bring the case within Madrid's purview).

So, that leaves only Soto-Peguero's contentions that the inclusion of a description of the evidence turned up during the

warrantless entry in the warrant affidavit and "the officers' false testimony" at the suppression hearing satisfy the Madrid standard, at least when considered in the context of how the officers conducted themselves at that time. We assume, for the sake of argument only, that the Eighth Circuit's holding that the officers in Madrid "exploited their presence" in the defendant's home extends to encompass this flavor of alleged misconduct. Even still, here, too, we are not persuaded.

The affidavit attached to the search warrant application did describe evidence that Task Force members uncovered pursuant to what that affidavit characterized as a "security sweep." And, as Soto-Peguero notes, the District Court later found that some of that evidence was obtained through methods that exceeded the scope of such a sweep. But, we do not see how this mismatch suffices to support Soto-Peguero's Madrid-based suppression argument. The Task Force members had been shot at as they tried to enter the residence and would later testify that they found the evidence while trying to secure the apartment and locate the firearm in question. In such circumstances, we cannot say that the warrant application's erroneous description of the means by which that evidence had been acquired constitutes the kind of egregious conduct that, per Madrid, could justify suppression. Cf. United States v. Paradis, 351 F.3d 21, 29 n.7 (1st Cir. 2003) (describing scenarios in which a protective sweep might properly authorize an

- 20 -

officer to specifically search for weapons).  Consistent with this conclusion, we note that the District Court made no finding here that any law enforcement officer involved in the preparation of the warrant application either knowingly included unconstitutionally obtained evidence or knowingly misdescribed that evidence as having been lawfully obtained.

With respect to Soto-Peguero's contention that Madrid requires suppression here based on his allegation that Task Force members gave false testimony at the suppression hearing, we are likewise unpersuaded.  The District Court did explain that it was not fully persuaded by the Task Force members' testimony at the suppression hearing regarding what happened during the warrantless entry.  But, the District Court also concluded that there was no basis for finding on this record the kind of egregious or flagrant official misconduct that would require suppression in order to not sully the prophylaxis of the Fourth Amendment.  Soto-Peguero, 252 F. Supp. 3d at 13-14.  In the face of that ruling and the absence of any finding by the District Court that the Task Force members who testified at that hearing did so in bad faith, we see no basis for requiring suppression even were we to accept Soto-Peguero's argument that we should adopt the Madrid standard.

Because Soto-Peguero has not succeeded in establishing that the United States failed to meet the requirements for applying

the inevitable discovery doctrine, we affirm the District Court's denial of his motion to suppress.

## III.

Soto-Peguero also challenges the fact that the Probation Office applied a two-level role enhancement to increase the Guidelines range for his drug possession-related crimes from 168-210 months to 210-262 months.

Under § 3B1.1(c) of the Guidelines, a defendant's offense level is increased by two levels if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving four or fewer participants. For the enhancement to apply, the government bears the burden of proving, by a preponderance of the evidence, that "the criminal enterprise involved at least two complicit participants (of whom the defendant may be counted as one)" and that "the defendant, in committing the offense, exercised control over, organized, or was otherwise responsible for superintending the activities of, at least one of those other persons." United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997). "The determination of an individual's role in committing an offense is necessarily fact-specific. Accordingly, appellate review must be conducted with considerable deference." Id. (internal citation omitted). Even a single instance of managing the actions of others can substantiate the enhancement. See United States v. Voccola, 99 F.3d 37, 44 (1st Cir. 1996).

- 22 -

Soto-Peguero argues that the entirety of the government's case for the enhancement is that, on two occasions, he stated that he was "sending" Cabral. He asserts that, beyond that, there is nothing in the record to support the conclusion that he and Cabral "were anything other than equal participants in criminal activity."

The United States points out that Soto-Peguero had "scores of communications" with Mejia-Ramos, while Cabral only interacted with him to ask to which house she should go. On one occasion, Mejia-Ramos contacted Soto-Peguero and told him the heroin was poor quality. Soto-Peguero replied: "My woman is on the way." Later, Cabral retrieved what were presumably the inferior drugs from Mejia-Ramos's cousin. On another occasion, after Cabral dropped off a package, Mejia-Ramos called Soto-Peguero to ask what he had sent. Per the government's characterization, "both Mejia-Ramos and his cousin treated Cabral as a mere delivery person and engaged only Soto-Peguero in important business decisions."

At sentencing, the District Court -- after presiding over a six-day trial and observing both Soto-Peguero and Cabral -- concluded that "Soto-Peguero was running the show." He "told [Cabral] to go to Brockton or wherever it was on a number of occasions." That was where she "ultimately got caught."

Based on all the evidence cited by the United States, and accounting for the fact that the District Court had the opportunity to observe the witnesses and the defendant firsthand, we cannot conclude that the District Court clearly erred in holding that the government had shown by a preponderance of the evidence that Soto-Peguero was managing or supervising Cabral on at least one occasion. We therefore affirm the District Court's decision.

**IV.**

As described above, we **affirm** both Soto-Peguero's convictions and his sentence.