# United States Court of Appeals
## For the First Circuit

No. 18-1569

UNITED STATES OF AMERICA,

Appellee,

v.

ISMAEL E. CRUZ-RAMOS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. William E. Smith, U.S. District Judge]
[Hon. Aida M. Delgado-Colón, U.S. District Judge]

---

Before

Howard, Chief Judge,
Thompson and Kayatta, Circuit Judges.

---

Ruth M. Liebesman, for appellant.
Francisco A. Besosa-Martínez, Assistant United States
Attorney, with whom W. Stephen Muldrow, United States Attorney,
and Mariana E. Bauzá-Almonte, Assistant United States Attorney,
Chief, Appellate Division, were on brief, for appellee.

---

January 27, 2021

---

**THOMPSON**, <u>Circuit Judge</u>.

**OVERVIEW**

We deal again with fallout from a bloody war between two Puerto Rico-based gangs known to all involved as La ONU and La Rompe.[1] Today's appeal — a sequel to <u>Ramírez-Rivera</u> — focuses on Ismael Cruz-Ramos, an accused La ONU leader indicted and convicted of committing (or aiding and abetting others in committing) the crimes of: RICO conspiracy, count 1; drug conspiracy, count 2; conspiracy to possess firearms in furtherance of the drug conspiracy, count 3; VICAR murder of a La Rompe boss nicknamed "Pekeke," count 29; and using and carrying a firearm in relation to Pekeke's murder, count 30.[2] Last time around, we vacated his convictions because the police lacked probable cause to search his house — and so held that the evidence seized had to be suppressed. <u>See</u> 800 F.3d at 31-34. Back in the district court, Cruz-Ramos convinced the judge to suppress some incriminating statements as well. But a jury again convicted him of the relevant charges.

---

[1] Interested readers can find some of our other writings on this subject at <u>United States</u> v. <u>Rodríguez-Torres</u>, 939 F.3d 16 (1st Cir. 2019); <u>United States</u> v. <u>Laureano-Salgado</u>, 933 F.3d 20 (1st Cir. 2019); <u>United States</u> v. <u>Rivera-Carrasquillo</u>, 933 F.3d 33 (1st Cir. 2019); and <u>United States</u> v. <u>Ramírez-Rivera</u>, 800 F.3d 1 (1st Cir. 2015).

[2] For the uninitiated, RICO is the standard acronym for the Racketeering Influenced and Corrupt Organizations Act and VICAR is the accepted acronym for the Violent Crimes in Aid of Racketeering Act.

And after losing a motion for acquittal or new trial and getting sentenced to life plus 25 years, he filed the present appeal.[3] This time, however (after noting only what is necessary for resolving his current set of issues, ranging from claimed trial problems to supposed sentencing glitches), we leave him as we found him.[4]

**ALLEGED TRIAL ERRORS**

Cruz-Ramos mounts several arguments either for judgments of acquittal or for a new trial.

Convinced that the judge erred in denying his acquittal motion, Cruz-Ramos claims that four out of the five convictions failed on evidentiary-insufficiency grounds: the RICO-conspiracy conviction (count 1), because the evidence supposedly did not show that La ONU ran as a continuous unit; the drug-conspiracy conviction (count 2), because the evidence allegedly did not prove that he belonged to a La ONU-owned drug point at a public-housing

---

[3] Judge William E. Smith (of the District of Rhode Island, sitting by designation) handled the trial. And Judge Aida M. Delgado-Colón (of the District of Puerto Rico) handled the sentencing.

[4] A quick heads up: The standard of review varies with the issues and whether Cruz-Ramos preserved them in the district court. Helpfully, the parties agree on (or at least do not openly argue over) which claims he did and did not preserve below. And we see no reason to quarrel with them. See, e.g., United States v. Sabean, 885 F.3d 27, 44 (1st Cir. 2018) (taking a similar approach in a similar situation).

project; the firearms-conspiracy conviction (count 3), because the evidence purportedly did not show that he possessed La ONU-owned guns; and the VICAR-murder conviction (count 29), because the evidence allegedly did not prove that he played a role in Pekeke's killing.[5]

Shifting gears, Cruz-Ramos criticizes the judge for not giving the jurors a multiple-conspiracy instruction, seeing how he thinks the evidence did not connect the drug points to one another and so did not establish the single drug conspiracy alleged in the indictment. He also criticizes the judge for not telling the jurors that the government had to prove his "advance knowledge" that a partner would possess a real gun in furtherance of a drug-trafficking scheme, the advance-knowledge language coming from Rosemond v. United States, 572 U.S. 65 (2014).

Cruz-Ramos last argues that he at least deserves a new trial on all counts, because the judge wrongly admitted evidence concerning his harboring a fugitive. As he sees it, that evidence — involving both a plea agreement in which he pled guilty to

---

[5] Cruz-Ramos does not attack the evidentiary sufficiency of his conviction for using and carrying a firearm in relation to Pekeke's murder (count 30). So he has waived any argument he might have. See, e.g., Rodríguez v. Municipality of San Juan, 659 F.3d 168, 175 (1st Cir. 2011). And to the extent he thinks his brief does make that attack, it is waived for lack of development. See id. (noting that arguments mentioned but not developed are waived).

harboring a fugitive and the fugitive's offense conduct — constituted "fruits" of searches held illegal in our earlier opinion, lacked relevance, and posed a high risk of undue prejudice. All of which means — in his mind anyway — that the judge should have granted his new-trial motion.

Like the government, we find these arguments wanting.

**Acquittal**

We take a *de novo* look at Cruz-Ramos's preserved sufficiency claims, studying the record in the light most pleasing to the prosecution, giving the prosecution the benefit of all sensible inferences and credibility choices as well — and rejecting his challenges if any rational jury could have convicted him when viewing all the evidence (direct and circumstantial) in this way. See, e.g., Rodríguez-Torres, 939 F.3d at 23; United States v. Manor, 633 F.3d 11, 13-14 (1st Cir. 2011). That he may have a reasonable theory of innocence will not move the needle, because the issue is not whether a rational jury *could have acquitted* but whether it rationally *could have found guilt* beyond a reasonable doubt. See, e.g., Manor, 633 F.3d at 14.

*Rico Conspiracy*

Getting a grip on RICO's intricacies is no easy matter. But generally, the statute criminalizes engaging in a pattern of racketeering activity as part of "an enterprise," or

"conspir[ing]" to do the same.  See 18 U.S.C. § 1962(c), (d).  An enterprise includes not only a legal entity like a "corporation" but also "any union or group of individuals associated in fact." United States v. Turkette, 452 U.S. 576, 579 n.2 (1981) (quoting 18 U.S.C. § 1961(4)).  And while "the very concept of an association in fact is expansive," such an entity must have "at least" these "structural features":  a "purpose," "relationships among those associated with the enterprise," and "longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 944, 946 (2009). So an association-in-fact entity can be either "formal or informal," as long as the enterprise's "various associates function as a continuing unit."  Turkette, 452 U.S. at 583.  But that enterprise need not have a "hierarchical structure or a 'chain of command'" and no purpose beyond carrying out a pattern of racketeering acts.  See Boyle, 556 U.S. at 946-48.

Cruz-Ramos's sole complaint is that prosecutors produced inadequate proof "of an organization that worked as an ongoing unit" (so framed, his argument eliminates any need to discuss RICO's other elements).  But the claim is hopeless when one reads the record the right way — afresh, and in the light most agreeable to the government.

Cooperating witnesses fingered Cruz-Ramos as a La ONU leader, a firearms supplier, and a heroin drug-point owner at Las Gladiolas, a La ONU-dominated public-housing project. And they did much more than that. They also chronicled La ONU's roughly *decade*-long work as a union of various housing-project gangs, with the unifying goals being running more drug points and taking down common enemies like La Rompe — using deadly violence whenever needed. Identifiable by its name — the "ONU" in La ONU "stands for Organización de Narcotraficantes Unidos," which in English means "Organization of *United* Drug Traffickers," see Rodríguez-Torres, 939 F.3d at 25 (emphasis added) — this mega-gang used special hand signals to differentiate its members from other members; made and enforced strict rules of conduct (*e.g.*, no fraternizing with La Rompe gangbangers or cooperating with the police, on pain of death); and required associates at different La ONU-controlled drug points to share resources (guns, drugs, manpower, *etc.*) in its bid to be the biggest and baddest crime syndicate around. And while not necessary (courtesy of Boyle, which held that an association-in-fact enterprise need have no formal hierarchy or decision-making mechanism), La ONU had — throughout its *many years* of operation — a main leader (though members close to him had a say in important gang matters, apparently), drug-point owners, enforcers, sellers, and lookouts.

That is ample evidence of La ONU's functioning as a continuous unit, despite what Cruz-Ramos says. See, e.g., Rodríguez-Torres, 939 F.3d at 24-25 (finding similar evidence sufficient).

### *Drug Conspiracy*

A series of statutes criminalize conspiring to distribute drugs within a 1,000 feet of a public-housing facility. See 21 U.S.C. §§ 841(a), 846, 860. With that in mind, we need not linger long over Cruz-Ramos's claim that no evidence showed that he "belonged [in a] group operating" in a La ONU-dominated public-housing project. After all, cooperators testified that he owned a heroin drug point at the La ONU-run Las Gladiolas public-housing facility. Calling the cooperators' statements too speculative, he implies that the jury should not have believed them. But his argument goes to credibility, something we cannot consider in reviewing this challenge.[6] See, e.g., Manor, 633 F.3d at 14.

### *Firearms Conspiracy*

Also unpersuasive is Cruz-Ramos's claim that the firearms-conspiracy conviction cannot stand, because no evidence proved that he "possessed weapons in furtherance of drug

---

[6] Cruz-Ramos also hints at an argument that prosecutors offered insufficient evidence about the existence or amount of "heroin that was sold." But that argument cannot win the day either, given the testimony about his having run a heroin drug point.

- 8 -

trafficking." The "in furtherance of" element here requires "[a] showing [of] a sufficient nexus between the firearm and the drug crime [or crime of violence] such that the firearm advances or promotes the drug crime [or crime of violence]." Ramírez-Rivera, 800 F.3d at 23 (quoting United States v. Gurka, 605 F.3d 40, 44 (1st Cir. 2010), and discussing 18 U.S.C. §§ 924(c)(1)(A), 924(o)) (alteration in original). And undercutting Cruz-Ramos's argument is evidence showing both that he "[a]lways" carried automatic weapons with him as he ran his drug point and that he gave his La ONU associates guns — all to protect and expand the gang's drug turf.

Perhaps anticipating that we might reach this conclusion, Cruz-Ramos tries to downplay the evidence, labeling it nothing more than "a generic assertion" that he "was an enforcer." But a glance at the testimony of one cooperator is sufficient to refute the claim, for he not only identified Cruz-Ramos as an enforcer but specifically described how he and Cruz-Ramos — often with others, and always armed to the teeth with assault rifles and the like — went "to other housing projects" multiple times "to shoot them up."

In something of a last stand here, Cruz-Ramos faults prosecutors for not linking him to any of the guns presented at trial. But even if he did not own those guns, the jury heard

- 9 -

testimony that he carried guns and gave them to his La ONU allies — with the goal being to further the gang's drug interests. So this argument is not a difference-maker. See id. (rejecting a similar argument on similar grounds).

*VICAR Murder*

As relevant to Cruz-Ramos's case, VICAR outlaws "attempting or conspiring to commit murder" for "the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." See 18 U.S.C. § 1959(a)(5). Cruz-Ramos contests his VICAR conviction for aiding and abetting Pekeke's murder (remember that Pekeke was a La Rompe leader), alleging that no evidence "connect[ed]" him to that crime. He is wrong.

Viewing the record in the light most sympathetic to the government's case (as required), we see evidence of the following — all supporting the aiding-and-abetting theory behind this conviction. Cruz-Ramos attended a meeting where La ONU leaders kicked around ideas on how to off Pekeke. Ultimately, they agreed to pay a person named "Joshua" to gun Pekeke down at a La Rompe-dominated public-housing project and then send a rescue crew in to get Joshua out. Cruz-Ramos gave the crew a fake license plate and registration sticker to put on a rescue car (to hide the fact that the car was stolen). And after the shooting, rescuers went to

Joshua's aid — all armed, including Cruz-Ramos, who drove his own SUV.

An undaunted Cruz-Ramos notes that cooperator José Gutiérrez-Santana did not name him as a planning member attendee or as a rescuer. But cooperator Wesley Figueroa-Cancel did both. And the jurors could decide "which witness to credit," with us required to assume, "in the posture of a sufficiency-of-the-evidence challenge, . . . that they credited those witnesses whose testimony lent support to the verdict." See United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999).

Cruz-Ramos also notes that cooperators never said that he knew why rescuers needed "a vehicle and plate." But the jurors could reasonably infer from his rescue-mission participation that he knew what those items were for. See Rodríguez-Torres, 939 F.3d at 23 (reminding us to make all natural inferences "in the government's favor" when considering a sufficiency-of-the-evidence claim).

Pulling out all the stops, Cruz-Ramos says that the "government's scientists contradicted" the cooperators. For example, he claims (with no record cites) that cooperators said "Joshua . . . was shot as he ran from the project, but no blood trail or trace was found"; that "[n]o police report or medical record suggests Joshua was shot"; and that an "investigator

- 11 -

observed no evidence of the crime in front of the project or the road leading to it, contradicting the theory of a shooting in front of" the project. As touched on above, the usual rule is that "[s]ifting through conflicting testimony and determining where the truth lies is the sort of work that falls squarely within the jury's province," not ours. See United States v. Nascimento, 491 F.3d 25, 46 (1st Cir. 2007). And Cruz-Ramos gives us no reason to vary from that rule (like showing that each cooperator's testimony was so implausible that we cannot trust it as a matter of law). So this line of argument is a dead end too.

With the sufficiency issues out of the way, we examine Cruz-Ramos's claims of instructional error.

## Jury Instructions

Cruz-Ramos's preserved claim about the missing multiple-conspiracies instruction gets abuse-of-discretion review, with us reversing only if he can show "he suffered substantial prejudice." See United States v. Camacho-Santiago, 851 F.3d 81, 85 (1st Cir. 2017); see also United States v. Brandon, 17 F.3d 409, 450 (1st Cir. 1994) (elaborating that in the alleged multiple-conspiracies setting, "[t]he prejudice we must guard against" is the prejudicial spillover of evidence "resulting from trying defendants *en masse* for distinct and separate offenses committed by others"). And his unpreserved claim about the missing advance-knowledge instruction

- 12 -

gets plain-error review, see United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001), with him having to make the difficult showing that the judge erred and clearly so, and that the error also affected his substantial rights — but even then we can still affirm if he does not show as well that the error seriously harmed the fairness, integrity, or public perception of his trial, see United States v. Takesian, 945 F.3d 553, 563 (1st Cir. 2019); see also United States v. Dominguez Benitez, 542 U.S. 74, 83 n.9 (2004) (noting that satisfying each facet of the plain-error test is a daunting task, "as it should be"); Paniagua-Ramos, 251 F.3d at 246 (stressing that "the plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors").

*Multiple Conspiracies*

Sometimes the simplest approach is the best approach. See, e.g., United States v. Tsarnaev, 968 F.3d 24, 78 (1st Cir. 2020) (explaining that "[o]ften '[t]he simplest way' to decide an issue is 'the best'" (first alteration added) (quoting Stor/Gard, Inc. v. Strathmore Ins. Co., 717 F.3d 242, 248 (1st Cir. 2013)). So it is here. Even assuming — without granting — that the evidence justified a multiple-conspiracies instruction, its omission did not substantially prejudice Cruz-Ramos. And that is because, while Cruz-Ramos may not have gotten the exact instruction that he

- 13 -

wanted, the judge did tell the jurors that the government had to prove that he (Cruz-Ramos) was part of the charged drug conspiracy. "[Y]ou must be convinced," the judge said, "that the government has proven beyond a reasonable doubt" that the conspiratorial "agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to possess with the intent to distribute a controlled substance" and that Cruz-Ramos "willingly joined that agreement." And "[i]f . . . you [have] a reasonable doubt," the judge added, then "you must" acquit. Quite a number of our cases have found instructions of this sort sufficient to protect a defendant from prejudice in circumstances like Cruz-Ramos's. See United States v. Belanger, 890 F.3d 13, 33 (1st Cir. 2018) (collecting authority); see also Camacho-Santiago, 851 F.3d at 87. And Cruz-Ramos offers no plausible reason why those cases should not control here.

*Advance Knowledge*

Citing Rosemond, Cruz-Ramos argues that the judge slipped by not telling the jurors that, to find him guilty of aiding and abetting possession of a gun in furtherance of a drug crime (what a mouthful), they had to find he had "advance knowledge" that a gun would be used. See 572 U.S. at 77-81. And, the theory goes, because of that lack of instruction, the jurors could have convicted him merely because he intended to help commit

- 14 -

the underlying drug-trafficking crime — without ever finding that he had prior knowledge that a compatriot would possess a gun.

Rosemond addressed aiding-and-abetting liability for the "compound" offense of using or carrying a firearm while committing certain violent or drug-related crimes. See 572 U.S. at 67-68, 71 (analyzing 18 U.S.C. § 924(c)(1)(A)). "[I]ntent must go to the specific and entire crime charged," Rosemond said, "the full scope (predicate crime plus gun use) of § 924(c)." Id. at 76. So an accused aider and abettor must have had "advance knowledge" that a cohort would "use or carry a gun during [its] commission," because he must have decided "to align himself with the illegal scheme in its entirety — including its use of a firearm." Id. at 67; see generally United States v. Fernández-Jorge, 894 F.3d 36, 52-55 (1st Cir. 2018) (finding Rosemond error in a nonplain-error case, because the aiding-and-abetting instruction let the jury convict even if the defendant intended only the general "endeavor" to succeed, rather than the firearm-specific crime).

Cruz-Ramos concedes that he did not raise this Rosemond issue at trial. Which means he must run the usually lethal gauntlet of plain-error review — *i.e.*, (and to repeat) he must show not only error, but error that is obvious, affects his substantial rights, *and* seriously undermined the fairness, integrity, or public perception of the judicial process. See

- 15 -

generally United States v. Manso-Cepeda, 810 F.3d 846, 852 n.7 (1st Cir. 2016) (stating that "the First Circuit already had an advance knowledge requirement for aiding and abetting convictions" before Rosemond and "has consistently used the 'consciously shared' formulation to describe our aiding and abetting law," making "an error in which the district court used a well-established formulation . . . unlikely to qualify as plain error"). But Cruz-Ramos makes *no* attempt to show how his Rosemond-based claim satisfies the demanding plain-error standard — his brief fails to even mention plain error, let alone argue for its application here. See generally Fed. R. App. P. 28(a)(8)(A) (announcing that "[t]he appellant's brief must contain" the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies"). And knowing that it is not on us to construct a party's arguments for him, see United States v. Charriez-Rolón, 923 F.3d 45, 52 (1st Cir. 2019), that failure waives this claim, see United States v. Velázquez-Aponte, 940 F.3d 785, 800 (1st Cir. 2019); United States v. Severino-Pacheco, 911 F.3d 14, 20 (1st Cir. 2018); United States v. Pabon, 819 F.3d 26, 33-34 (1st Cir. 2016).[7]

---

[7] One other jury-instruction claim requires brief attention. The government premised the VICAR-murder charge on an aiding-and-abetting theory under Puerto Rico law. But Cruz-Ramos says that the judge gaffed the aiding-and-abetting instructions, arguing that Puerto Rico did not recognize aiding and abetting murder as

Enough said about these issues.

**New Trial**

We inspect Cruz-Ramos's problem with the judge's new-trial denial for abuse of discretion, knowing that an abuse of discretion exists "only when no reasonable person could agree with the judge's decision," see Laureano-Salgado, 933 F.3d at 29, that a material error of law is by definition an abuse of discretion, see United States v. Carpenter, 736 F.3d 619, 629 (1st Cir. 2013), and that we ordinarily overturn a new-trial denial only to prevent

_____

a crime "at the time of the offense." Looking to counter this claim, the government cites a *decades*-old opinion by Puerto Rico's highest court (issued well before his crimes went down) — an opinion stating that Puerto Rico's penal code "not only considers as principals or authors those who directly commit the punishable offense, but those as well who *aid* in the commission thereof." People v. Martés Olán, 3 P.R. Offic. Trans. 488, 492 (P.R. 1975) (quoting People v. Vélez, 36 P.R.R. 521, 523-24 (P.R. 1927)) (emphasis added). Our Ramírez-Rivera opinion read Puerto Rico law as punishing a person as a principal if he "'participates directly in the commission of a crime,' 'forces, provokes, *abets* or induces another person to commit a crime,' or 'cooperates before, simultaneously or after the commission of a crime, and without whose participation the crime could not have been perpetrated.'" 800 F.3d at 22 n.16 (quoting P.R. Laws Ann. tit. 33, §§ 4671(a), (b), (d)) (emphasis added). And with Ramírez-Rivera on the books, Cruz-Ramos writes that he raises this issue simply to preserve his right to petition for *en banc* or Supreme Court review based on his belief that the quoted English translation misconstrues the word "instigar" in the original Spanish to include "abet." But see University of Cambridge, Spanish-English Dictionary, http://dictionary.cambridge.org/dictionary/spanish-english, "instigar". So we need say no more on that subject.

- 17 -

a miscarriage of justice, see United States v. Ackerly, 981 F.3d 70, 75 (1st Cir. 2020).

To understand Cruz-Ramos's claim, we must provide some necessary context.

According to the evidence admitted at trial, a La ONU member named "Bernard" shot down a police helicopter to help himself and other La ONU-ers avoid arrest. One of the pilots died. And Bernard fled to Cruz-Ramos's house. Acting on a tip, the police went there and searched the place without a warrant, seizing guns and drugs — a search we stamped unconstitutional in Ramírez-Rivera. The police arrested Cruz-Ramos and Bernard. About three months later, Cruz-Ramos pled guilty under a plea agreement to harboring a fugitive. In a document attached to the agreement, Cruz-Ramos admitted certain facts — including that the police wanted Bernard for the helicopter shooting. And over Cruz-Ramos's objections, the judge in our case allowed the plea agreement and accompanying statement of facts into evidence.

With this backdrop in place, we now consider Cruz-Ramos's arguments.

As for Cruz-Ramos's lead claim — that the judge should have excluded as fruit of an illegal search all evidence about his harboring-a-fugitive plea agreement, which included his concessions concerning Bernard's crime — the factors that go into

this issue are: (a) the voluntariness of his concessions, (b) the temporal proximity of the illegal conduct and the concessions, (c) the existence of intervening events, and (d) the flagrancy of the illegality. See, e.g., Brown v. Illinois, 422 U.S. 590, 603-04 (1975); United States v. Stark, 499 F.3d 72, 76 (1st Cir. 2007) (discussing the Brown factors). No single factor is determinative, however. See Brown, 422 U.S. at 603.

Because no one doubts that Cruz-Ramos voluntarily signed the plea agreement (factor (a)), and the government concedes for present purposes that the police acted egregiously (factor (d)),[8] the dispute here is really over factors (b) and (c). And so we turn to them.

Cruz-Ramos signed the plea agreement three months after the illegal search (factor (b)) — far more than the two days between an illegal search and a confession in another case that we said "counsel[ed] against suppression." See Stark, 499 F.3d at 76. And during those intervening months, he had time to reflect on his situation and consult with a lawyer before signing the plea agreement (factor (c)) — an agreement, by the way, that he has never tried to invalidate as a product of the illegal search.

---

[8] We ourselves called the search an "egregious Fourth Amendment violation" and said "the officers' disregard of probable cause was certainly deliberate." See Ramírez-Rivera, 800 F.3d at 32, 33.

- 19 -

Given these particulars — and mindful that evidence exclusion should be a "last resort" rather than a "first impulse," see Hudson v. Michigan, 547 U.S. 586, 591 (2006) — we think that the causal link between the illegality and the plea agreement is so stretched that the illegality did not infect the plea agreement, see Brown, 422 U.S. at 598 (emphasizing that a confession caused by unlawfully seized evidence need not be suppressed if "an intervening independent act of free will . . . purge[s] the primary taint" of the illegal search (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)); see generally United States v. Davis, 617 F.2d 677, 687-89 (D.C. Cir. 1979) (refusing to suppress a defendant's grand-jury testimony (provided as part of his plea agreement) given weeks after an illegal arrest when he had "time to consult with counsel and to reflect on his decision to cooperate," because "[t]he taint of the . . . illegality had dissipated by the time [he] took the witness stand").[9]

---

[9] Joining belt with suspenders, we add that as the party invoking the exclusionary rule — a judicially crafted remedy, aimed at curbing police misconduct by (broadly speaking) barring prosecutors from introducing at the defendant's trial evidence obtained through the misconduct — Cruz-Ramos must show not only causation, but also that the rule's benefits (deterrence) outweigh its costs (*e.g.*, excluding relevant evidence and perhaps letting a guilty person go free). See Herring v. United States, 555 U.S. 135, 140-41 (2009); Hudson, 547 U.S. at 591. Yet his brief contains no such weighing analysis, creating a gaping hole that also sinks this aspect of his new-trial claim.

We are likewise unmoved by Cruz-Ramos's next set of claims — that the judge should have excluded evidence about the helicopter downing and his fugitive harboring as irrelevant and unfairly prejudicial. And it will not take us long to explain why.

Relevancy is a very low threshold, requiring only that the evidence have "*any* tendency to make a fact more or less probable." See Fed. R. Evid. 401 (emphasis added); see also Bielunas v. F/V Misty Dawn, Inc., 621 F.3d 72, 76 (1st Cir. 2010). And "the evidence need not definitively resolve a key issue in the case," but rather "need only move the inquiry forward to some degree," see Bielunas, 621 F.3d at 76 — think, for example, of evidence that is basically "background in nature," which "is universally offered and admitted as an aid to understanding," see Fed. R. Evid. 401 advisory committee's notes.

So it is no exaggeration to say that "[a] relevancy-based argument is usually a tough sell." See Bielunas, 621 F.3d at 76. And Cruz-Ramos fails to make the sale here.

The indictment charged the helicopter-shooting murder as an overt act in furtherance of the RICO conspiracy. And "when the scope of a RICO conspiracy includes murder as a tool to further the enterprise, a 'murder [is] still relevant to the RICO count[] as it tend[s] to prove the existence and nature of the RICO

- 21 -

enterprise and conspiracy,'" even if the defendant on trial is "not charged for that particular killing." See Ramírez-Rivera, 800 F.3d at 44 (second and third alterations added) (quoting United States v. DeCologero, 530 F.3d 36, 54 (1st Cir. 2008)). Attempting to elude Ramírez-Rivera's grasp, Cruz-Ramos writes that the Ramírez-Rivera panel "was addressing" a different murder — "the Pep Boys murder."[10]  But nothing in Ramírez-Rivera limits this principle only to the Pep Boys murder.

The indictment also listed several "means and methods by which" La ONU members "conducted and participated" in the enterprise's "affairs," including "provid[ing] shelter and protection to known fugitive members of La ONU in order to aid against their apprehension by law enforcement."  And Cruz-Ramos's harboring-a-fugitive plea agreement helped bolster that charge, making the agreement relevant under our modest relevancy requirements.  See Polanco, 634 F.3d at 44 (noting how relevancy is usually an easy hurdle to clear); see generally United States v. Rodríguez-Soler, 773 F.3d 289, 293-94 (1st Cir. 2014) (stating that because convictions frequently "result from the cumulation of bits of proof which, taken singly, would not be enough in the mind

---

[10] The Pep Boys murder "involved the death of a La Rompe boss, killed on the orders of two La ONU leaders." Rivera-Carrasquillo, 933 F.3d at 45 n.11 (citing Ramírez-Rivera, 800 F.3d at 44).

- 22 -

of a fair minded person," a key factor in a relevancy determination is whether "each bit [has] enough rational connection with the issue to be considered a factor contributing to an answer" (quoting United States v. Pugliese, 153 F.2d 497, 500 (2d Cir. 1945) (L. Hand, J.))).

A judge of course "may" exclude relevant evidence if (roughly speaking) it is "unfair[ly] prejudic[ial]" to the defendant or risks confusing the jury, among other things. See Fed. R. Evid. 403. Seizing on this language, Cruz-Ramos argues that the challenged evidence packed too much of an emotional punch, prejudicing the jurors against him and causing them to act irrationally. The law bans not all prejudice, but *unfair* prejudice. See, e.g., Rodríguez-Soler, 773 F.3d at 296. And it does not save a defendant from damaging evidence generally. See, e.g., id. Ultimately, "[g]iven the nature of this violence-infested case, we see no reason why testimony about an additional murder would cause the jury an improper emotional reaction." See Ramírez-Rivera, 800 F.3d at 44.

Cruz-Ramos makes a single-sentence suggestion that jurors "could have been confused by" his harboring "confession," without offering any authority or meaningful discussion of the issue. So he waived it by inadequately briefing it. See, e.g., Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004) (holding waived a

perfunctory claim unaccompanied by "citation to any pertinent authority"); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (declaring it "not enough to merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work").

Cruz-Ramos also implies that his plea agreement presents a hearsay problem. But during the trial he agreed with the judge that the rule against hearsay posed no obstacle to admission. That aside, his brief "provides neither the necessary caselaw nor reasoned analysis to show" that his hearsay intimation is correct. See Rodríguez, 659 F.3d at 176. And again, such cursory treatment is not enough to preserve an issue for review. See, e.g., id.

Making a last-ditch bid to save this claim, Cruz-Ramos writes that because "[t]he helicopter murder was excluded by the district court during the first trial," the judge should have done the same in the second. But he makes this argument only in his reply brief and so waived that one as well. See, e.g., Liberty Mut. Ins. Co. v. Nippon Sanso K.K., 331 F.3d 153, 162 (1st Cir. 2003) (holding that an "argument . . . not made in the opening brief but only in the reply . . . is waived").

On to sentencing.

**ALLEGED SENTENCING ERRORS**

Cruz-Ramos claims that the judge made three procedural sentencing errors — first by imposing a 2-level enhancement for his having played a leadership role in the crimes, next by assessing 2 criminal history points against him for his prior conviction for harboring a fugitive, and finally by having a 25-year sentence on the count of using and carrying a firearm in relation to Pekeke's murder run consecutively to the life sentences on the other counts.[11]  We review preserved challenges for abuse of discretion and unpreserved ones for plain error, see, e.g., United States v. Garay-Sierra, 832 F.3d 64, 67 (1st Cir. 2016) —

_____

[11] A quick crib sheet on how federal sentencing works:  Using advisory sentencing guidelines, the judge figures out the defendant's

> base offense level — *i.e.*, a point score for a specified offense or group of offenses.  The [judge] then make[s] adjustments for any aggravating or mitigating factors in the defendant's case, thus arriving at a total offense level.  The [judge] also assign[s] points based on the defendant's criminal history — points that get converted into various criminal history categories, designated by Roman numerals I through VI.  Armed with this info, the judge turns to the guidelines's sentencing table.  And by plotting the defendant's total offense level along the table's vertical axis and his criminal history category along the table's horizontal axis, the judge ends up with an advisory prison range.  From there, the judge sees if any departures are called for, considers various sentencing factors, and determines what sentence (whether within, above, or below the suggested range) seems appropriate.

United States v. Martínez-Benítez, 914 F.3d 1, 2 n.2 (1st Cir. 2019) (citations omitted).

as a reminder, the hard-to-satisfy plain-error standard requires a defendant to show error; plainness; an adverse effect on his substantial rights; and a serious compromise of the fairness, integrity, or reputation of the trial, see, e.g., Takesian, 945 F.3d at 563.

These arguments lack heft, as the government points out.

**Enhancement**

We can make relatively quick work of Cruz-Ramos's unpreserved complaint about the leadership enhancement — an enhancement justified only if the government proved each of the following by a preponderance of the evidence: that "the criminal enterprise involved at least two complicit participants (of whom [Cruz-Ramos] may be counted as one)"; and that "in committing the offense," Cruz-Ramos "exercised control over, managed, organized, or . . . otherwise . . . superintend[ed] the activities of . . . at least one of those other persons." See United States v. Soto-Peguero, 978 F.3d 13, 23 (1st Cir. 2020) (quoting United States v. Cruz, 120 F.3d 1, 3 (1st Cir. 1997)). As part of this analysis, a judge looks to a variety of factors, including the nature and degree of the defendant's participation, planning, and control — and whether he exercised decisionmaking authority, drafted collaborators, or claimed a bigger piece of the spoils. See USSG

§ 3B1.1 cmt. 4; see also United States v. Ilarraza, 963 F.3d 1, 14 (1st Cir. 2020).

We approach a judge's leadership assessment with "considerable deference," given the fact-intensive character of the inquiry. See Soto-Peguero, 978 F.3d at 23 (quoting Cruz, 120 F.3d at 3). Add to this that Cruz-Ramos must show that the judge plainly erred, and his level of difficulty escalates exponentially. See, e.g., Tsarnaev, 968 F.3d at 80 (stressing how the plain-error rule places a formidable obstacle in an appellant's way).

Cruz-Ramos rests his hopes solely on the notion that "[n]o evidence" showed he controlled or managed a participant. But to reject this claim, all we need do is observe that a cooperator said that as a drug-point owner within the organization, Cruz-Ramos "order[ed] . . . other guys" around — something only La ONU "leaders" could do. See Soto-Peguero, 978 F.3d at 23 (noting that "[e]ven a single instance of managing the actions of others can substantiate the enhancement"). Cruz-Ramos implies that he cannot be a leader because "every drug point owner was a leader" and with so many "leader[s], no one is a leader" for sentencing purposes. But unfortunately for him, the law is that "more than one person" can "qualif[y] as a leader or organizer of a criminal

- 27 -

association or conspiracy." See USSG § 3B1.1 cmt. 4. So what he offers is hardly the stuff of plain error.

## Criminal History

That takes us to Cruz-Ramos's preserved claim that the judge wrongly assigned criminal-history points for his harboring-a-fugitive conviction. To hear him tell it, that conviction involved conduct relevant to the RICO conspiracy and so could not be factored into his criminal-history score. As support, he (at least implicitly) relies on a guideline rule saying that when tweaking a defendant's sentence for his prior criminal history, a judge may use as a "prior sentence" only a "sentence previously imposed . . . for conduct *not* part of the instant offense." See USSG § 4A1.2(a)(1) (emphasis added); see also id. § 4A1.2 cmt. 1 (excluding from the criminal-history calculation sentences for conduct qualifying as relevant conduct under USSG § 1B1.3).

But Cruz-Ramos overlooks a key guideline exception in the RICO context. Even if some convictions count as part of the underlying racketeering conduct, if the defendant got convicted of them before "the last overt act of the [RICO] offense," the judge can treat them as part of the defendant's criminal history. See USSG § 2E1.1 cmt. 4. So while prosecutors used Cruz-Ramos's harboring-a-fugitive conviction to support the RICO-conspiracy charge, because that conviction came before the final overt act

(as no one here disputes), it contributes points toward his criminal-history tally.

### Consecutive Sentences

We need not say much about Cruz-Ramos's last preserved claim either. He concedes that a firearm-in-furtherance sentence under 18 U.S.C. § 924(c) must run consecutively to any prison sentence on any other count (including the count covering the crime in which the firearm was used). See 18 U.S.C. § 924(c)(1)(D)(ii). But he insists that "[§] 924(j), not [§] 924(c), determined [his] sentence" — roughly speaking, § 924(j) makes it a crime to kill anyone when doing acts that infract § 924(c), but does not mention a consecutive-sentencing requirement.[12] And citing an Eleventh

---

[12] § 924(c) pertinently provides that

[a]ny person who, during and in relation to any crime of violence or during a drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime,

receive a sentence of at least 5 years. See 18 U.S.C. § 924(c)(1)(A)(i). § 924(c) ups that minimum if he brandishes or discharges the firearm or uses a certain type of firearm (*e.g.*, a machine gun). See id. § 924(c)(1)(A)(ii)-(iii), (c)(1)(B)(i)-(ii). And § 924(c) declares that the sentence cannot "run concurrently" with any other. See id. § 924(c)(1)(D)(ii).

§ 924(j) then relevantly says that "a person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm," shall "be punished by death or by imprisonment for any term of years or for life" if the killing constitutes "murder" under 18 U.S.C. § 1111 (essentially

- 29 -

Circuit case, United States v. Julian, 633 F.3d 1250 (11th Cir. 2011), he asserts that a § 924(j) sentence need not run consecutively to any other sentence.

The problem for Cruz-Ramos, however, is that his two-sentence argument lacks both record cites and supporting analysis — for what it is worth, the government disputes his account of the record, saying that he "was charged and convicted" under § 924(c) and that "the jury instructions and jury form pertained to § 924(c), not § 924(j)"; and the government also notes that other circuits disagree with the Eleventh's interpretive view (the thinking of those courts being that § 924(j)'s reference to § 924(c) incorporates § 924(c)'s consecutive-sentencing decree). See generally United States v. Dillon, 720 F. App'x 310, 311 (7th Cir. 2018) (listing circuits standing against Julian's reading of the relevant statutory schemes). And given this state of affairs, we second the government's suggestion that Cruz-Ramos waived this rather complex claim by the superficial treatment he gave it. See Rodríguez, 659 F.3d at 175-76 (deeming waived arguments not seriously developed in a party's opening brief); Braintree Lab'ys., Inc. v. Citigroup Glob. Mkts. Inc., 622 F.3d 36, 44 (1st Cir. 2010) (same).

---

defining murder as "the unlawful killing of a human being with malice aforethought").

## WRAP UP

For the reasons recorded above, we affirm the district court across the board.