# United States Court of Appeals
# For the First Circuit

No. 23-1067

UNITED STATES OF AMERICA,

Appellee,

v.

PEDRO A. MARTÍNEZ-MERCADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Raúl M. Arias-Marxuach, U.S. District Judge]

Before

Montecalvo, Thompson, and Aframe,
Circuit Judges.

José B. Vélez Goveo, with whom Vélez & Vélez Law Office was on brief, for appellant.

Thomas F. Klumper, Assistant United States Attorney, Senior Appellate Counsel, with whom W. Stephen Muldrow, United States Attorney, and Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

March 19, 2025

**AFRAME**, **Circuit Judge**.  After serving as postmaster of the Sabana Grande Post Office, Pedro Martínez-Mercado ("Martínez") moved from Puerto Rico to New Jersey with a postal remittance bag containing over $11,000 in cash and money orders.  For this conduct, a jury in the District of Puerto Rico convicted him of misappropriating postal funds and stealing or converting government property, in violation of 18 U.S.C. §§ 1711 and 641, respectively.  The district court sentenced Martínez to six months in prison.

On appeal, Martínez argues that the district court should have permitted him to admit certain evidence showing that he intended to return the funds; the court gave an erroneous supplemental jury instruction; the prosecutor offered improper remarks in her rebuttal argument; and the evidence failed to support his convictions.  Because Martínez's arguments are waived or fail under the applicable standard of review, we affirm the judgment.

## I.

We begin by rehearsing the background facts relevant to the sufficiency challenge in the light most favorable to the jury verdict, and the facts relevant to the remaining challenges "in a 'balanced' manner."  See United States v. Lanza-Vázquez, 799 F.3d 134, 138 n.1 (1st Cir. 2015) (quoting United States v. Burgos-Montes, 786 F.3d 92, 99 (1st Cir. 2015)).

- 2 -

Martínez worked for twenty-one years as a United States Postal Service employee. For five of those years, from 2012 until November 2017, Martínez served as the postmaster of the Postal Service branch located in Sabana Grande, Puerto Rico (the "SGPO"). In November 2017, Martínez left Puerto Rico to become a Network Transportation Manager in Kearney, New Jersey, where he remained until he retired from the Postal Service in 2019.

As the SGPO postmaster, Martínez managed all aspects of the branch's finances. For example, he oversaw the daily reconciliation of customer transactions involving cash and money orders and prepared corresponding bank deposits, referred to as "remittances," in accord with standardized Postal Service procedures.

The Postal Service procedures dictate that, at the close of business each day, the postal employee responsible for preparing the daily remittance receives a computer-generated report itemizing all money orders and cash collected from customers that day, as well as reconciliations from each window clerk with a tally of their cash-based transactions. The preparer reviews and consolidates this information onto a final remittance form detailing that post office's totals for that day's cash and money order sales, which is transmitted to the Postal Service's finance department. The cash and money orders are then placed inside a remittance bag with a deposit slip itemizing its contents. The

- 3 -

remittance bag is sealed and secured in that post office's vault until a contract carrier delivers it to another regional post office and then ultimately to the bank for deposit. The bank reports the remittance it receives each day to the Postal Service which, in turn, reconciles the preparer's final remittance form with the bank's report.

Martínez was responsible for preparing the daily remittance on September 18, 2017, which was the last day the SGPO was open for business before Hurricane Maria struck the island on September 20, 2017. Aligned with Postal Service procedures, Martínez compiled the day's cash receipts and money orders -- which collectively totaled $11,435.02 -- into a remittance bag, sealed the bag, and placed it in the SGPO's vault.

In the week that followed the storm, Martínez and a handful of other SGPO employees returned to the SGPO to assess the damage to the branch and initiate a clean-up effort that lasted several days. At some point during the clean-up process, Martínez decided to remove the September 18 remittance bag from the vault "to use [the funds therein] for some personal matters" and "for all the work that needed to be carried out" at the SGPO following Hurricane Maria.[1] Martínez did not consult any of his superiors

---

[1] This included, according to Martínez, purchasing meals for workers who were volunteering their time to help get the SGPO operational.

or otherwise seek permission to open or use the remittance. Martínez later informed postal window clerk Víctor Méndez that he had opened the September 18 remittance but only after learning that Méndez intended to access the SGPO vault.

The SGPO reopened to the public on September 30, 2017. On October 10, 2017, a backlog of daily remittances was deposited at the bank. At Martínez's instruction, Méndez withheld the September 18 remittance bag from the group of remittances deposited on October 10. The opened remittance sat in the SGPO vault in the weeks that followed. On his last day of work at the SGPO in November 2017, Martínez removed the September 18 remittance from the vault to take it with him to New Jersey, where it remained in his possession until the Postal Service uncovered his conduct.

In December 2017, the Postal Service discovered a $11,435.02 difference between the total listed on the SGPO's final remittance form for September 18, 2017, and the bank's reported deposit for that date. On December 11, 2017, the finance department contacted Carlos Olivencia, the lead supervisor at SGPO following Martínez's transfer to New Jersey, and asked him to investigate the discrepancy. Olivencia discussed the matter with employees and obtained copies of the relevant documentation, through which he confirmed that the September 18 remittance had been prepared by Martínez but never arrived at the bank. On December 15, 2017, Olivencia contacted the Office of the Inspector

General (the "OIG") to formally report as missing the September 18 remittance.

Olivencia's investigation included a discussion with Méndez and, on December 11, 2017, Méndez contacted Martínez via text message to alert him that the Postal Service had inquired about the missing September 18 remittance. Martínez did not respond until three days later, when he texted back to explain that the remittance was not "missing" because he took it with him to New Jersey. He also said that he planned to send the money orders back to Yolanda Chang, another postal window clerk at the SGPO.

In the days after Méndez texted Martínez, Martínez engaged in a flurry of activity to recreate the September 18 remittance and return it to the SGPO. Per the final remittance form, the September 18 remittance contained $5,942 in cash and $5,493.02 in checks and money orders. To replenish the missing cash, Martínez instructed his friend and former colleague, Elisber Pacheco, to collect $1,100 from two associates in Puerto Rico ($1,000 from one associate and $100 from the other), then give $1,075 to Chang and keep a $25 fee for his efforts.

Meanwhile, on December 13, 2017, Martínez mailed an envelope to Chang containing the deposit slip, $5,493.02 in cashed checks and money orders from the September 18 remittance, and five new money orders made out to Chang totaling $4,867. Martínez

called Chang to alert her about the forthcoming envelope and cash from Pacheco, both of which were promptly turned over to an OIG agent upon receipt. Combined, Martínez returned to Chang the same amount of postal proceeds included in the September 18 remittance at the time it was sealed.

In January 2018, an OIG agent interviewed Martínez in New Jersey. Martínez admitted that he took the September 18 remittance to New Jersey and used it for "personal reasons." The OIG concluded that Martínez was not authorized to take the remittance, that did he not notify any of his colleagues about his plans to do so, and that the Postal Service lost money because of his actions.

A grand jury thereafter indicted Martínez on one count of misappropriation of postal funds, 18 U.S.C. § 1711, and one count of theft or conversion of government property, 18 U.S.C. § 641. At trial, the government presented testimony from seven former and current Postal Service employees, including those responsible for investigating the matter and those involved in Martínez's attempt to return the September 18 remittance. The government also presented testimony from the OIG agent who intercepted the cash and envelope that Martínez sent to Chang and interviewed Martínez in New Jersey.

Martínez testified in his defense. He admitted to knowingly violating Postal Service policies by opening the

remittance bag and taking it to New Jersey. He said that he took the remittance to New Jersey because "[i]t was open and money was missing." His primary defense theory was that he needed the money from the September 18 remittance to address pressing personal and work-related needs caused by Hurricane Maria and thus took the funds without the requisite criminal intent. Martínez initially testified that he used approximately $400-500 from the September 18 remittance for the Postal Service's benefit and another $200-300 for personal expenses. He later, however, identified $1,075 as the amount of cash that he "needed to replace" to finish reconstructing the remittance.

The jury found Martínez guilty on both counts. Martínez timely appealed.

## II.

Martínez presses four arguments in this Court. First, he claims that the district court erroneously granted a motion in limine preventing him from presenting evidence that he intended to repay the remittance funds. Second, he asserts that the district court incorrectly instructed the jury on the intent required to convict him under one of the statutes of conviction. Third, he contends that he was prejudiced by allegedly improper remarks offered by the prosecutor during her rebuttal argument. And, finally, he challenges the sufficiency of the evidence to support his convictions. We consider these arguments in turn.

## A.

Prior to trial, the government filed a motion in limine addressing the possibility that Martínez would argue that he took the September 18 remittance with the "future intent" to repay those funds. The government urged the district court to follow extra-circuit authority to rule that Martínez's intent to repay would be immaterial to the trial issues. The government's motion sought, inter alia, a specific ruling that any evidence regarding Martínez's intent to repay would be excluded as irrelevant.

Martínez did <u>not</u> oppose the government's motion, and the district court thereafter granted it, ordering Martínez not to offer "evidence or argument pertaining to his alleged intent to repay the stolen funds." At the start of trial, the government reminded the court of its in limine ruling and reiterated that the prosecutors would object to any argument by Martínez about his intent to repay. Martínez responded: "We understand and we know what the [district court's] ruling is concerning the intent to repay. Unless the [g]overnment opens that door during its case in [c]hief, the [d]efense will not mention the intent to repay." And, at the close of trial, Martínez did not object to the government's proposed jury instruction that "intent to repay or replace is not a defense to the charged offense."

Despite Martínez's failure to object to the district court's in limine ruling, he now contends that the ruling was

erroneous because proof that he intended to repay the funds was "probative to . . . whether he had the requisite intent to be convicted of the charges." He says that he was prejudiced by the exclusion of such evidence because the jury did not learn that "the entire time he intended to pay the funds in full."

The government argues that we should deem Martínez's claim waived -- as opposed to merely forfeited -- because of his actions in the district court and thus afford it no appellate review. Waiver based on a defendant's district court conduct requires the record to show "that the defendant intended to forgo a known right." United States v. Bruno-Cotto, 119 F.4th 201, 206 (1st Cir. 2024) (citing United States v. Eisom, 585 F.3d 552, 556 (1st Cir. 2009)); see also United States v. Olano, 507 U.S. 725, 733 (1993) ("[W]aiver is the intentional relinquishment of a known right." (citation omitted)). "But where the record reveals only a failure to bring forth a claim because of 'something less deliberate' such as 'oversight, inadvertence, or neglect in asserting a potential right,' the defendant has only forfeited the claim." Bruno-Cotto, 119 F.4th at 206 (quoting Eisom, 585 F.3d at 556). Under those circumstances, the claim may be pursued on appeal, albeit under the strict plain error standard. Id.

It is not entirely clear from the record that Martínez affirmatively relinquished his right to dispute the exclusion of evidence relating to his intent to repay. On the one hand,

- 10 -

Martínez failed to object to the motion in limine, which led to the district court's ruling about which he now complains. And his other actions (acknowledging that he "underst[ood]" the court's in limine ruling and not objecting to the intent-to-repay instruction) are potentially consistent with forgoing a known right because they may suggest agreement with the court's ruling. On the other hand, Martínez's actions could suggest that he believed that he had missed his opportunity to raise this issue by failing to oppose the government's motion in limine and thus could not press the intent-to-repay argument any further.

But we do not need to definitively decide whether these actions add up to an "intentional relinquishment" in the district court, Olano, 507 U.S. at 733, or "something less deliberate," Bruno-Cotto, 119 F.4th at 206 (citation omitted), because Martínez has clearly waived his claim through his actions on appeal. Martínez does not dispute that he failed to object to the in limine ruling and thus, at a minimum, forfeited his ability to challenge it. See United States v. Griffin, 818 F.2d 97, 99-100 (1st Cir. 1987) (stating that a defendant who fails to preserve a challenge to the exclusion of evidence by "mak[ing] his complaint known to the trial court in due season . . . forfeits much of his opportunity thereafter to complain about ensuing mistakes" (citing Fed. R. Evid. 103)). Yet, Martínez proceeds in this Court as though he preserved the claim. He does not mention plain error in

his opening brief and presents his intent-to-repay argument under the abuse of discretion and harmless error standards applicable to preserved claims of error.  Only in his reply brief, after the government highlighted Martínez's preservation failings, does Martínez present an argument that even references plain error.

That is too late.  A defendant on appeal waives a forfeited claim when "his brief fails to even mention plain error, let alone argue for its application." United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021).  Martínez did not possess a reasonable basis for proceeding as if he had preserved his argument contesting the in limine ruling; nevertheless, he argues as though he did.  The failure to "tie his claim to [the] exacting [plain error] standard . . . means he's waived the claim." United States v. Fargas-Reyes, 125 F.4th 264, 274 (1st Cir. 2025).[2]

**B.**

Martínez's second argument is that the district court failed to properly instruct the jury on the specific intent

---

[2]     Even if we were to overlook the waiver, Martínez's claim would likely fail.  Plain error's second prong requires a defendant to show that any error in the district court's ruling was "clear or obvious." United States v. Sansone, 90 F.4th 1, 8 (1st Cir. 2024).  This Court has never considered whether intent-to-repay evidence is relevant under the statutes at issue here. See United States v. Romero, 906 F.3d 196, 207 (1st Cir. 2018) ("With no binding precedent on his side, [the defendant] cannot succeed on plain-error review . . . .").

- 12 -

required to convict him on Count Two, which alleged theft or conversion of government property. This argument is also waived.

The final jury charge on Count Two mirrored the language proposed by both parties for the three elements required under 18 U.S.C. § 641:

> First, that the money and money orders described in the Indictment belonged to the United States and exceeded $1,000;
>
> Second, that Defendant knowingly and willfully stole or converted such money and money orders for his own use or the use of another person; and
>
> Third, that Defendant did so with the intent to deprive the United States of the use or benefit of the money and money orders.

The final jury charge also included instructions defining "knowingly" and "willfully." Martínez confirmed that he did not object to the final jury charge, and the district court instructed the jury accordingly.

After deliberating for about three hours, the jury sent the district court a note with an apparent question on Count Two. The court relayed the jury's note to the parties, which stated that the jury had "a doubt" concerning "the intent to deprive" referenced in the third element of Count Two. The court interpreted the jury as wanting guidance on "how to determine intent as to the third element of [Count Two] of the indictment." The court then solicited the parties' feedback on a proposed response that would advise the jury that "[t]he intent required by

- 13 -

[Count Two] is that the acts be knowing and willful" and refer the jurors to the instruction defining those terms.

At first, Martínez objected to the proposed response. He argued that while the second offense element obligated the government to show that he committed the charged acts "knowingly and willfully," the third element imposed an independent requirement that the government prove he acted "with the intent to deprive" the United States of the use or benefit of the remittance. Accordingly, to avoid "lower[ing] the jury's appreciation in terms of the intent . . . required," Martínez requested that the court refer the jury to the elements as described in the final jury charge.

After some additional discussion, the district court asked Martínez if his concerns would be allayed by a revised response reminding the jury "to deliberate using the evidence in the case and considering all the instructions that have been given to you." Martínez responded: "Okay, we would agree to that, with that clarification." The court then reiterated the final supplemental instruction to make sure that everyone was "on the same page." The instruction provided:

> The intent required by Count [Two] is that the acts be knowing. The definition of knowing is found in Jury Instruction Number 15. Please remember that you are to deliberate and make your findings based on all the evidence in the case and being guided by all the instructions you were given.

After the court finished reading the instruction, Martínez responded "[y]es, yes," thus confirming that he, in fact, remained "on the same page."

Despite these statements of agreement, Martínez seeks now to renew his initial claim that the supplemental instruction effectively "lower[ed]" the government's burden of proof. The government contends that this claim, like Martínez's first, is waived. We agree.

"A party who identifies an issue [to the district court], and then explicitly withdraws it, has waived the issue." United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). That principle applies here. Martínez articulated the same concerns he raises on appeal to the district court, and the court modified the supplemental instruction in response to those concerns. Martínez then proceeded to expressly agree to the instruction as revised and did not object when it was delivered. Having agreed to the district court's proposed instruction, Martínez cannot now complain about its content. See United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006) (finding that defendant whose counsel stated "I am content" after jury was instructed expressly waived his objection for the purposes of appeal). The claim is waived.

## C.

Martínez next challenges remarks from the prosecutor during her rebuttal argument that he says improperly denigrated

- 15 -

his theory of the case. Because Martínez did not object to the remarks, we review for plain error. United States v. Figueroa-Encarnacion, 343 F.3d 23, 27 (1st Cir. 2003). In applying that standard, we evaluate the prosecutor's statements within the context of the entire record, United States v. Smith, 982 F.2d 681, 682 (1st Cir. 1993), and vacate only on a finding that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process," United States v. King, 554 F.3d 177, 181 (1st Cir. 2009) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)).

Martínez's closing argument focused largely on his lack of criminal intent to convert postal funds for his own use. He argued that he only took the remittance because of the emergency circumstances presented by Hurricane Maria, emphasizing that he "never intended to keep [it]" and, in fact, would have ultimately deposited the remittance but for the investigating agent interfering with his attempt to return the funds.

The government addressed Martínez's proffered defense in rebuttal, stating:

> How dare they imply that the remittance was not deposited because the Government [seized] that money and envelope on December 18th? When all the evidence that we have presented here is evidence that Mr. Martínez did not deposit the remittance because he chose not to deposit the remittance.

- 16 -

What Defense is trying to do is what it always does when it has no defense, blame it on the victim, in this case, the United States of America. Really? He didn't deposit that because [the agent] got the envelope? Really?

Martínez challenges the government's comment that he was "trying to do what [a defendant] always does when [he] has no defense, blame it on the victim[.]" He argues that such commentary "improperly denigrated" his theory of the case and created the "unfair impression" that the government believed he had advanced a "sham" defense.[3] The government retorts that the statement "was nothing more than the prosecutor responding to [Martínez's] argument, attacking and exposing the flaw in the argument, and suggesting a reasonable inference that the jury could make."

We agree with Martínez that the prosecutor should not have likened his failure-to-deposit theory to a strategy commonly adopted by defendants "when [they] ha[ve] no defense." In making this remark, the prosecutor suggested Martínez's proffered defense warranted skepticism based on her personal knowledge of other cases she had prosecuted. Such commentary runs afoul of the prohibition on prosecutors "interject[ing] personal credibility or opinion into argument." United States v. Tajeddini, 996 F.2d 1278, 1283

---

[3] Martínez also asserts that the prosecutor improperly characterized his defense regarding his failure to deposit the remittance as "nonsense." But a review of the record shows the prosecutor never used that term -- a fact pointed out by the government to which Martínez offers no response.

(1st Cir. 1993); see United States v. Boldt, 929 F.2d 35, 40 (1st Cir. 1991) (deeming improper a prosecutor's characterization of the defense strategy as "a favorite defense tactic" due to the "institutional nature of the comment").

Nevertheless, the prosecutor's remark does not warrant relief under plain error review. As an initial matter, the remark was singular and isolated; in all other respects, the prosecutor argued for a guilty verdict based on the evidence presented at trial. See United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999) (noting that the "isolated" nature of the prosecutor's two "inappropriate" comments mitigated any harm). Moreover, immediately after the rebuttal, the district court provided general instructions admonishing jurors that "it would be a violation of [their] sworn duty, as the judges of the facts, to base [their] verdict upon anything but the evidence received in the case," and reminded jurors that "[s]tatements, arguments, and questions by lawyers are not evidence." See United States v. Kasenge, 660 F.3d 537, 543 (1st Cir. 2011) ("[A]ny potential harmful effect from the prosecutor's closing statement was safeguarded by the district court's final instructions." (citing United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987)).

Furthermore, the government presented a strong case. See id. ("[T]he well is deemed less likely to have been poisoned where strong evidence supports the prosecutor's case." (citation

- 18 -

omitted)).  Martínez admitted to the key facts supporting conviction and hinged his defense primarily on a lack-of-criminal-intent theory, which seems especially weak given the district court's uncontested instruction that intent to repay was not a defense.  See supra at Part II.A.  On this record, we are confident that the challenged statement did not "undermine the fairness of the trial and contribute to a miscarriage of justice." United States v. Young, 470 U.S. 1, 16 (1985).  Accordingly, the challenged comment does not provide a basis for granting a new trial.

### D.

Finally, we address Martínez's challenge to the evidentiary sufficiency of his convictions.  Because Martínez timely moved for a judgment of acquittal, we review the district court's denial of that motion de novo.  United States v. Rivera-Rodríguez, 617 F.3d 581, 596 (1st Cir. 2010) (citation omitted).  In doing so, "we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution and decide whether that evidence, including all plausible inferences drawn therefrom, would allow a rational factfinder to conclude beyond a reasonable doubt that the defendant committed the charged crime."  United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008) (citing United States v. Moreno, 991 F.2d 943, 948 (1st Cir. 1993)).

To obtain a conviction for misappropriating postal funds, 18 U.S.C. § 1711, the government had to prove that: (1) Martínez was a Postal Service employee; (2) who as such came into possession of money and money orders exceeding $1,000; and (3) knowingly and intentionally converted that money or property to his own use. See United States v. Bui, 152 Fed. App'x 159, 160 (3d Cir. 2005) (outlining the required elements for a conviction under § 1711). The district court instructed the jury that "to 'convert' means to take something with intent to deprive the owner of its use or benefit either temporarily or permanently."

To obtain a conviction for converting government property, 18 U.S.C. § 641, the government had to prove that: (1) the money and money orders in the September 18 remittance exceeded $1,000; (2) Martínez knowingly and willfully stole or converted such money for his own use or the use of another person; and (3) Martínez did so with the intent to deprive the United States of the use or benefit of the money and money orders. See United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993) (outlining the required elements for a conviction under § 641); see also United States v. Hall, 549 F.3d 1033, 1038 (6th Cir. 2008) (same). The government also had to establish that Martínez "acted with the specific intent" to commit the charged conduct, i.e., to "steal" or "convert" the September 18 remittance from the United States. See United States v. González-Martínez,

- 20 -

825 F.3d 51, 55 (1st Cir. 2016) (citing United States v. Donato-Morales, 382 F.3d 42, 47 (1st Cir. 2004)).  The district court instructed that "to 'steal' or 'convert' means to take something with intent to deprive the owner of its use or benefit either temporarily or permanently."

Leaving behind his failing arguments about what the government was required to prove as a matter of law (i.e., disproving his intent to repay), Martínez presses two fact-based challenges to his conviction.  First, he contends that he lacked "the knowledge and intent" required for a reasonable jury to convict him.  Second, he claims that the evidence failed to show that he stole or converted over $1,000 of postal funds for his own use.[4]  Neither argument is persuasive.

The evidence showed that Martínez opened a sealed remittance bag containing $11,435.02 in postal funds, removed a portion of the funds to pay for personal expenses, and then prevented any portion of the remittance from being deposited for nearly three months.  Martínez admitted that he was trained on and understood that opening the sealed remittance bag, using funds from the remittance, and taking temporary possession of the

---

[4]    To the extent Martínez seeks to challenge the sufficiency of the evidence to support any other element of the counts of conviction, we consider any such arguments waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1990).

- 21 -

remittance violated Postal Service rules. He also understood that violating Postal Service rules for handling a remittance could constitute a crime. And he further testified that he knew that he deprived the United States of its ability to use the remittance proceeds by taking the remittance bag with him to New Jersey.

A reasonable jury could conclude beyond a reasonable doubt that, by opening the remittance bag and using some of its contents without authorization, Martínez possessed the requisite knowledge and intent to convert postal funds for his own use. See Morissette v. United States, 342 U.S. 246, 272 (1952) (holding that conversion extends to "use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use"). A reasonable factfinder could also decide that Martínez had the specific intent to deprive the United States of using those funds at least temporarily. See, e.g., United States v. Sofidiya, 165 F.3d 22, at *3 (4th Cir. 1998) (unpublished table decision) (affirming convictions under §§ 641 and 1711 where evidence showed that the defendant "withdrew money orders for himself without submitting a voucher or logging the sale," as required by Postal Service procedures).

Martínez asserts that his lack of criminal intent is evidenced by the absence of proof that he took "any affirmative action to hide or conceal the fact that he had used part of the money of the September 18 remittance." The record belies this

contention. Martínez instructed Méndez not to include the opened September 18 remittance with the backlog of remittances that was sent to the bank after Hurricane Maria and, ultimately, took the remittance with him to New Jersey without authorization "because money was missing from [the remittance] and [he] knew that [he] needed to return it." It is true that Martínez did not further conceal that he had taken the postal funds once Méndez contacted him in New Jersey. But by then he had kept the funds from being deposited for months -- including by taking the remittance with him when he transferred to New Jersey -- without telling anyone besides Méndez about his conduct. A reasonable jury could view these actions as evidencing Martínez's efforts to conceal his use of the September 18 remittance funds until his misconduct was otherwise discovered.

Martínez's second challenge relies on his testimony describing how he spent the funds that he took from the September 18 remittance in the days immediately following Hurricane Maria. Specifically, he highlights that he admitted only to using $200 to $300 dollars for his "personal use" and another $400 to $500 "for the [Postal Service's] own benefit." Martínez suggests that, given this testimony, a jury could not conclude that he knowingly converted over $1,000 "for his use or benefit."

The jury was not, however, required to consider Martínez's testimony in isolation or accept his self-serving

statements.  There was no corroboration for Martínez's claim that he used a portion of the $1,075 that he removed from the September 18 remittance for the Postal Service's benefit.  In addition, the government presented evidence that a postmaster could obtain a no-fee money order to pay for emergency Postal Service expenses and established that Martínez exercised this prerogative to pay for an expense which he claimed to have covered using remittance funds.

Moreover, Martínez admitted that he prevented the entire remittance from being deposited until he received a text from Méndez inquiring into its whereabouts in December 2017, at which point he mailed back an envelope containing new money orders to replace the $4,867 in cash.  A reasonable jury could infer that Martínez used that cash for personal use and therefore needed to replace it with money orders when he learned that the Postal Service knew the money was missing.  See O'Malley v. United States, 378 F.2d 401, 403 (1967) (finding defendant's failure to turn over cash receipts to disbursing officer "amply support[ed] a conclusion that the defendant received money belonging to the United States and deliberately retained it for his own use").

## III.

For the reasons stated, Martínez's convictions are **affirmed**.