# United States Court of Appeals
## For the First Circuit

No. 24-2002

UNITED STATES OF AMERICA,

Appellee,

v.

ADERITO PATRICK AMADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Rikelman, Lynch, and Aframe,
Circuit Judges.

Michael G. Eaton, Donna J. Brown, and Wadleigh, Starr &
Peters, P.L.L.C. on brief for appellant.

Donald C. Lockhart, Assistant United States Attorney, and
Leah B. Foley, United States Attorney, on brief for appellee.

October 17, 2025

**LYNCH**, **Circuit Judge**.  In late 2020 and early 2021, Massachusetts law enforcement investigated a suspected drug-trafficking organization (DTO) in the South Shore area.  Evidence led law enforcement to focus on two apartments likely used to store and distribute the drugs: one on Audubon Road in Weymouth and another on Ricciuti Drive in Quincy.  On January 11, 2021, investigators executed state search warrants at both locations, recovering large amounts of narcotics, cash, firearms, and drug-trafficking equipment.  Earlier that day, officers conducted a warrantless stop of a blue Jeep Grand Cherokee linked to the DTO and driven by Aderito Patrick Amado.  A search of the Jeep uncovered additional drugs and cash.

Following a nine-day trial, a jury convicted Amado of one count of conspiracy to possess with intent to distribute fentanyl, fentanyl analogue, and cocaine, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A)(vi), and 841(b)(1)(B)(ii); three counts of possession with intent to distribute those substances, based on seizures from both apartments and the Jeep, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vi), 841(b)(1)(B)(ii), and 841(b)(1)(B)(vi); two counts of being a felon in possession of firearms, for three guns recovered from the Audubon apartment and one from the Ricciuti apartment, in violation of 18 U.S.C. § 922(g)(1); and one count of possessing the firearms from the

- 2 -

Audubon apartment in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A).[1]

The district court sentenced Amado to concurrent terms of 324 months on the drug counts and 120 months on the felon-in-possession counts, plus a consecutive 60-month term on the firearm-in-furtherance count, for a total of 384 months' imprisonment, which was within the Guidelines range.

Amado appeals from his convictions and his sentence. As to his convictions, he argues that the district court erred in denying his motion to suppress evidence discovered when officers stopped and searched the Jeep he was driving, arguing that the officers lacked reasonable suspicion for the stop. As to his sentence, Amado makes several claims of error. He asserts procedural error in the district court's application of a two-level obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 and in its designation of him as a career offender under U.S.S.G. § 4B1.1. He also contends that his sentence is substantively unreasonable under 18 U.S.C. § 3553(a) because his co-defendant Kevin Cardoso received a much shorter prison term. We affirm.

## I. Motion to Suppress

Before trial, Amado moved to suppress all evidence

---

[1] The jury acquitted Amado of possessing the firearm from the Ricciuti apartment in furtherance of drug trafficking.

recovered from the Jeep,[2] arguing that officers lacked reasonable suspicion for the stop, exceeded the scope of any lawful stop by ordering him and the two male passengers out and frisking them, and lacked probable cause or any valid exception to search the Jeep. The government, in opposition, responded that officers had reasonable suspicion for the stop based on what they observed: the Jeep's ties to the Audubon and Ricciuti apartments, which had been connected to suspected DTO activity and as to which two state search warrants had issued. The government further argued that officer safety concerns justified ordering the men out and frisking them and that drugs seen inside the Jeep provided probable cause to search it.[3]

On appeal, Amado argues that the district court erred in finding that the stop was supported by reasonable suspicion.[4]

---

[2] Amado also filed motions to suppress evidence seized from the Audubon and Ricciuti apartments, but he does not challenge the district court's denial of those motions on appeal.

[3] Both sides attached exhibits to their filings. Amado submitted a January 11, 2021 report by Detective Brian Coen, who participated in the stop, and an affidavit from defense counsel. The government also included Coen's January 11 report, along with state search warrants and search-warrant applications for the Audubon and Ricciuti apartments; a January 11, 2021 report by Detective Jeffrey Bossart; a January 11, 2021 report by Sergeant Richard Tapper; inventories from the apartment and Jeep searches; and GPS and probation records.

[4] Amado has abandoned on appeal any challenge to the officers' actions after the stop, including ordering the occupants out of the Jeep, frisking them, and searching the car.

**A.**

We recite the record facts relevant to that analysis.

On or about September 21, 2020, a consortium of local police departments known as the South Shore Drug Task Force began working with a confidential informant to make controlled fentanyl purchases from dealer Isiah Pires and his associates Jason Braun, Michael Boss, Leonardo Monteiro,[5] and Johnathan Abreu. The suspected DTO used particular cars, identified by the task force, to meet customers across the South Shore before returning to apartments that served as "stash" sites to pick up more drugs. After identifying the cars and often their occupants, investigators began tracking their daily resupply trips (or "re-ups") to determine which apartments were in use. These observations caused the task force to begin surveilling 35 Audubon Road in Weymouth on December 4, 2020, where Detective Jeffrey Bossart concluded the DTO had shifted much of its stash after detecting a police presence at a previous site. Subsequent surveillance led investigators to focus on Unit 401.

The task force was also surveilling Unit 1321 at 333 Ricciuti Drive in Quincy because of its suspected connection to the DTO. Between November 5, 2020, and January 4, 2021,

---

[5] This opinion refers to Leonardo Monteiro by his full name throughout to avoid confusion with an unrelated individual who shares the same last name and is introduced later.

investigators observed known DTO members and cars that had been linked to the group appear at the Ricciuti apartment and in its garages.

Investigation revealed that the Audubon and Ricciuti apartments, just eight miles apart, shared a common leaseholder: twenty-year-old Anisha Lopes. Detective Bossart, who had served as a Quincy police officer for four years before joining the department's Narcotics and Organized Crime Unit, where he had been for two years, obtained lease records in December 2020. Those records showed that Lopes had rented the Audubon apartment on October 23, 2020, and the Ricciuti apartment one or two weeks later. Her applications contained inconsistent job titles and inflated incomes: on the Audubon application, Lopes described herself as a medical assistant at Massachusetts General Hospital earning $7,000 per month, while on the Ricciuti application she listed herself as a nurse practitioner at Beth Israel Hospital earning $6,000, even though state licensing records indicated she was a certified nursing assistant. The Ricciuti lease listed the blue Jeep among the cars assigned to the apartment and included a second garage at additional cost. Detective Bossart concluded that the inconsistencies on the applications and the expense of maintaining two apartments within eight miles of each other suggested that Lopes was renting them on behalf of the DTO with drug proceeds.

Surveillance of the Audubon apartment reinforced to investigators its role in the DTO. They observed repeated short visits, described below, by known members and by cars previously connected to the group in controlled buys and other surveillance.

On December 4, 2020, Detective Bossart observed a Toyota Camry, which he recognized from prior surveillance at the Ricciuti apartment, back into a space along the side of the Audubon building. Roughly five minutes later, the driver, who looked to be Braun, got out and went into the building. The Camry then left with the passenger now behind the wheel.

On December 24, Bossart saw Abreu park a Dodge Ram in a lot near the Audubon building, jog in through the side entrance, and return to the truck within about three minutes. Bossart concluded that the quick visit was to pick up drugs from a stash.

On December 30, Detectives Bossart and Gerard O'Rourke noticed the Dodge Ram, this time with an unidentified driver, return to the Audubon building and stop by the side entrance. The driver stepped out, scanned the area, and looked toward the upper floors. O'Rourke then watched him catch what appeared to be a sock containing something, tossed from a corner window on the third, fourth, or fifth floor, before getting back into the truck and driving off. Bossart followed the Ram to a remote street, concluding that its driver likely conducted a drug deal there. The next day, Bossart learned from Audubon management that Unit

401 was the fourth-floor corner unit, and that Lopes rented Unit 401.

Also on December 31, Detective Bryan Donovan saw Pires pull a Dodge Durango registered to Pires's father into a spot along the tree line of the Audubon building, walk in through the side entrance, and return to his car within two minutes. Donovan concluded that Pires had retrieved drugs from a stash. Later that day, Detective Bossart saw the Dodge Ram again parked by the Audubon building's side entrance. Its passenger went inside, reemerged about seven minutes later carrying two white plastic trash bags, loaded them into the truck bed, and got back in before the driver pulled away.

On January 4, 2021, Detectives Bossart and O'Rourke saw the blue Jeep, which O'Rourke believed Braun was driving, stop at the Audubon building's side entrance. Braun then got out and retrieved a gray nylon bag from a pine tree beneath the window for Unit 401. The detectives concluded that Braun had come to collect his day's supply of fentanyl for distribution. Detective Michael Powers, who had been on a nearby street, saw the blue Jeep drive by after it left the Audubon complex and likewise identified Braun as the driver.

Later that day, Detectives Bossart and O'Rourke saw the Dodge Ram pull into the same spot where the Jeep had parked earlier. Using binoculars, Bossart watched as the Ram's passenger,

Leonardo Monteiro, walked into the Audubon building through the side entrance and entered Unit 401 for about five minutes before returning to the still-idling truck.  The detectives then noticed that the Dodge Durango had appeared and was backing into a spot along the tree line outside the Audubon building.  A man got out, spoke briefly with the Ram's occupants, and entered Unit 401 carrying a large, full backpack.  The Ram later drove to a Stop & Shop parking lot, where detectives lost sight of it but concluded it was likely involved in a drug deal.

Parallel surveillance of the Ricciuti apartment revealed repeated use of Unit 1321 and its garages by DTO members and by cars connected to the group.  On November 5, Detective Bossart observed an unoccupied white Jeep previously tied to Pires blocking the Unit 1321 garage, where it remained for about an hour before being driven away by an unidentified person.  On December 1, Bossart saw a white Ford Explorer, identified earlier in a controlled buy and through its resupplies at suspected stash sites, back into and park in the same garage.  The garage door stood open, and Pires lingered beside the driver's door with his hood pulled over his head.  A Toyota Camry, which Bossart had previously seen at the Ricciuti apartment and would later see at Audubon, blocked in the Explorer.  After about half an hour, the Explorer drove off.

On December 28, Detectives Bossart and O'Rourke saw the Dodge Durango back into the spot in front of the Unit 1321 garage. Alex Monteiro, Lopes's cousin and listed co-resident on the Ricciuti lease, came out of the garage and passed keys through the open driver's window to the Durango's driver, who then went into the apartment with him. About five minutes later, the driver, who appeared to O'Rourke to resemble Pires, emerged from the garage with his hood pulled tight and eyes down and drove off in the Durango. On December 31, Bossart observed the blue Jeep backed in directly in front of the same garage.

On January 3, Bossart saw Lopes return to Unit 1321 in the Toyota Camry with a child in the back seat. She carried some household items inside, then parked the car in a spot near the apartment. The next morning, Bossart confirmed that the Camry was still parked in the same spot, indicating it had been there overnight. Later that day, detectives again observed the Camry at the apartment, this time driven by a man resembling Alex Monteiro, who briefly went inside before driving away. From these observations, Bossart concluded that the Camry was regularly kept at the Ricciuti apartment.

On January 8, 2021, a state court issued search warrants for the Audubon and Ricciuti apartments. Both warrants were supported by 28-page affidavits summarizing the broader

- 10 -

investigation, including the controlled buys, surveillance, and lease records compiled over the prior months.

On January 11, investigators set up surveillance at both apartments in preparation for executing the search warrants. As events unfolded that day, detectives communicated all observations over a secure radio channel. Those at the Audubon building saw the blue Jeep approach, which they recognized from its connection to both apartments. The Jeep carried three men, all unknown to the detectives at the time, and stopped in the same area beside Unit 401 where it had parked a week earlier when Braun picked up a nylon bag. The front passenger, later identified as Neylton Fontes, got out and stood by the Jeep smoking a cigarette while scanning the area. Detectives concluded that he was acting as a lookout. A minute later, a woman later identified as Erica Vieira came out the same side door officers had seen Leonardo Monteiro use when visiting Unit 401. Vieira was holding a green plastic bag, walked to the Jeep's driver's window, and interacted with the driver (later identified as Amado) for less than a minute. She then returned inside without the bag. After that, Fontes got back in, and Amado drove away. The detectives watching all concluded that the Jeep had just completed a re-up.

The detectives who had observed the Jeep at the apartment communicated a request that it be stopped to nearby officers

assigned to the "Vehicle Stop Team." The stop team boxed in the Jeep with their cars on an adjacent street.[6]

At the suppression hearing, Amado argued, among other things, that officers lacked reasonable suspicion to stop the Jeep. He stressed that, on January 11, police did not recognize the Jeep's occupants, had never linked any of the three men to the Audubon or Ricciuti apartments or to prior controlled buys, and saw only a woman leave a five-story multi-unit building, approach the Jeep briefly, and then return inside. Detectives reported that she carried a green bag, but Amado pointed out that Vieira, as a cooperating witness, denied having one. Even if there had been a bag, Amado argued, such everyday conduct did not amount to reasonable suspicion.

The government argued that reasonable suspicion was supported by the officers' collective knowledge gained from months of investigating the DTO and weeks of surveillance at the Audubon and Ricciuti apartments: by January 11, the task force had state search warrants for both apartments leased to Lopes, and the blue Jeep, listed on the Ricciuti lease, had been seen at each location and was involved in a suspected resupply at Audubon on January 4.

_____

[6] A subsequent search of the Jeep revealed about 282 grams of fentanyl, 83 grams of crack cocaine, roughly $51,000 in cash (most of which was found in the green bag seen earlier), and six cell phones, along with paperwork tying Amado and Alex Monteiro to the Ricciuti apartment.

On January 11, the Jeep parked in the same spot by the Audubon side entrance used by other DTO cars during suspected resupplies on December 30 and 31, and its passenger acted as a lookout while a woman from the building apparently handed a green plastic bag to the occupants.

Stating it had "read all the papers," the district court concluded that reasonable suspicion supported the stop. We review de novo this conclusion and accept factual findings unless they are clearly erroneous. See United States v. Pavao, 134 F.4th 649, 654 (1st Cir. 2025). Clear error review is "exceedingly deferential." United States v. Millette, 121 F.4th 946, 951 (1st Cir. 2024) (quoting United States v. Matos, 328 F.3d 34, 39-40 (1st Cir. 2003)), cert. denied, 145 S. Ct. 1939 (2025).

**B.**

"Consistent with the Fourth Amendment, law enforcement agents may stop a moving automobile to investigate their reasonable suspicion that the vehicle's occupants were, are, or will be engaged in criminal activity." United States v. Kimball, 25 F.3d 1, 6 (1st Cir. 1994) (emphasis omitted). "To evaluate the overall reasonableness of this type of stop . . . the reviewing court must perform a two step inquiry: 'the court must first consider whether the officer's action was justified at its inception; and second, whether the action taken was reasonably related in scope to the circumstances which justified the interference in the first

- 13 -

place.'" Id. (quoting United States v. Walker, 924 F.2d 1, 3 (1st Cir. 1991)). "[W]hen applying this test . . . the [reviewing] court must consider the totality of the circumstances which confronted the officer[s] at the time of the stop." Id.

Amado contests only the first step: whether officers had reasonable suspicion to justify the Jeep stop at its inception. On this record, the undisputed facts establish that they did.

Amado argues that (a) it was clear error to rely on the brief contact between the woman and the Jeep's occupants and to conclude the passenger was acting as a lookout, and (b) officers had no reason to suspect the occupants of criminal activity because they did not recognize the three men. Multiple detectives saw the green bag and lookout behavior, and the district court was entitled to credit their account. See United States v. Brown, 621 F.3d 48, 56 (1st Cir. 2010) ("[T]he observations of experienced law enforcement officers are entitled to deference."). "[An officer's] observation did not have to be correct to constitute reasonable suspicion." Id. Nor did the lack of familiarity with the occupants of the Jeep undermine the finding of reasonable suspicion. See Illinois v. Wardlow, 528 U.S. 119, 124 (2000) (reasonable suspicion may rest on observed conduct even if officers do not know a suspect's identity).

Relatedly, Amado asserts that the Jeep's presence at a large multi-unit complex like Audubon must be given "little to no

impact" in the calculus. This is not the law. The task force knew the Jeep had ties to Unit 401 and saw an apparent exchange of the green bag. See United States v. Flores Perez, 849 F.2d 1, 8 (1st Cir. 1988) (finding reasonable suspicion for a motor vehicle stop where officers witnessed a seemingly prearranged pickup of a briefcase); see also United States v. Sheckles, 996 F.3d 330, 343 (6th Cir. 2021) ("[S]everal [sister circuits] have allowed officers to pull over individuals seen driving away from a residence when the officers have obtained . . . a search warrant for the residence.").

Amado next makes a categorically different argument, which misapprehends the law. He argues that the officers who carried out the stop were not the same ones who had observed the Jeep at the Audubon apartment previously and so lacked personal knowledge of all the investigative facts. That argument was not made below and is waived absent good cause. See United States v. Lindsey, 3 F.4th 32, 40-41 (1st Cir. 2021). It is also flatly wrong. In assessing reasonable suspicion, "we 'look to the collective information known to the law enforcement officers participating in the investigation rather than isolat[ing] the information known by the individual . . . officer'" who conducted the stop. United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021) (alteration in original) (quoting United States v. Azor, 881

- 15 -

F.3d 1, 8 (1st Cir. 2017)).  The task force had ample collective knowledge here.

## II.  Sentencing

We recount both the evidence and the sentencing proceedings relevant to Amado's sentencing challenges described earlier.  That evidence demonstrated Amado's extensive role in the DTO, a role he tried to minimize in his testimony, and that he was on probation from prior drug convictions at the time of these offenses.

Officers searching the Audubon apartment found a two-bedroom unit with significant quantities of drugs and paraphernalia and with largely no signs of occupancy, including no beds.  They recovered 12.5 kilograms of fentanyl, 11.72 kilograms of fentanyl analogue, 2.4 kilograms of heroin, 1.37 kilograms of cocaine base, 3.15 kilograms of cocaine, three pistols (including a .40 caliber Glock with a loaded large-capacity magazine and laser sight), additional ammunition and another large-capacity magazine, $17,471 in cash, a money counter, two kilo presses, digital scales, mixing bowls, cutting agents, and an ammunition tray and cutting-agent bag that bore Amado's fingerprints.

At the Ricciuti apartment, another two-bedroom unit, officers recovered approximately 42.7 grams of fentanyl, 113.6 grams of cocaine base, and 2.3 grams of cocaine, more than $270,000 in cash, a money counter, four cellphones (including one identified

as Amado's), a loaded .45 caliber Glock with additional magazines and ammunition, and evidence from the master suite (such as clothing and personal items) showing that Amado and then-girlfriend Lopes resided there.

Forensic analysis of four cellphones attributed to Amado, three recovered from the Jeep and one from the Ricciuti apartment, revealed extensive evidence of his involvement in the DTO. The phones showed Amado sending near-daily text messages to dozens of customers, negotiating drug sales in coded language that several customers confirmed referred to fentanyl and cocaine, discussing supply needs with other DTO members, and monitoring suspected law enforcement vehicles in the area. In early October 2020, he actively researched hydraulic presses, cutting agents, and Glock firearms, all later recovered from the Audubon apartment.

The phones also contained photos of Amado and his associates posing with large amounts of cash, videos of him flashing gang signs in what witnesses described as the drug mixing room at the Audubon apartment, and a video of him inside that apartment holding what appeared to be two of the three pistols later seized there: the .40 caliber Glock with a large-capacity magazine and a two-tone 9mm pistol.

He was not, as he portrayed, an insignificant figure. Vieira testified that Amado was a "top" player in the organization. She said he ran the Audubon stash site with co-defendant Kevin

Cardoso, personally mixed drugs, counted cash, and dealt with customers. One customer testified that he routinely bought fentanyl and crack from Amado, who used the name "Zeek," and helped him buy the blue Jeep through a straw purchase. Records showed that Lopes leased both the Audubon and Ricciuti apartments, and she acted under Amado's orders. Data from the GPS bracelet Amado wore on probation from prior drug convictions showed that he lived at the Ricciuti apartment and went to the Audubon apartment almost every day, sometimes several times in a single day and for hours at a time.

Amado testified in his own defense. He admitted that the drugs in the Jeep and at the Ricciuti apartment were his and that he had posed with some of the firearms recovered from the Audubon apartment. He testified that the drugs at the Audubon apartment were not his and that he did not own the guns seized there. He said he only occasionally visited the Audubon apartment to buy drugs, did not control it, did not know who it belonged to, and could enter only if someone else let him in. He added that his internet searches reflected mere curiosity about drug-trafficking equipment he had seen there.

The Presentence Report (PSR) set a base offense level of 38, corresponding to more than 159,000 kilograms in converted drug weight. It then added two levels for maintaining a drug premises and four levels for acting as a leader in the DTO. In an addendum,

Probation applied the career-offender guideline based on Amado's prior drug convictions. The resulting total offense level of 44, treated as 43 under the Guidelines cap, combined with a criminal history category of VI to yield an advisory range of life plus 60 months. The government objected to the PSR's failure to apply a two-level obstruction-of-justice enhancement, arguing that Amado perjured himself at trial. Probation deferred to the district court because it had not observed the trial. Amado objected to the PSR as well, disputing its drug-quantity finding, the leadership enhancement, the government's request for an obstruction-of-justice enhancement, the resulting offense level, the career-offender designation, and the calculation of his criminal history category.

The government's memorandum sought a 420-month sentence followed by ten years of supervised release,[7] emphasized the scale of Amado's trafficking and his recidivism, pressed for an obstruction-of-justice enhancement, and urged application of the career-offender guideline.

Amado asked for the statutory minimum of 180 months. His memorandum argued that the evidence submitted by the government to justify the obstruction-of-justice enhancement was "ambiguous

---

[7] In its sentencing memorandum, the government requested a five-year term of supervised release, but in a supplemental filing, it revised its recommendation to ten years "[b]ecause of the statutory enhancement applicable under 21 U.S.C. § 851."

at best" and that just because Amado researched an item later seized from the Audubon apartment does not mean he acquired it. He also argued that his prior convictions did not trigger the career-offender guideline and sought a downward variance, citing the lighter sentences received by co-defendants and other purported mitigating factors.

At sentencing, the district court set Amado's base offense level at 32 rather than 38, rejecting the PSR's drug-weight calculation. It then applied the PSR's recommended enhancements and found an obstruction-of-justice enhancement "certainly warranted," which together raised the offense level to 40. The district court also held that Amado qualified as a career offender.[8] With a total offense level of 40 and a criminal history category of VI, the Guidelines range was 360 months to life.

The district court declined to impose the 420-month sentence the government requested; it rather imposed a sentence of 384 months' imprisonment, followed by ten years of supervised release. The district court said the sentence was justified by the high aggregation of dangerous offenses, that Amado's

---

[8] The district court acknowledged that the career-offender designation did not affect Amado's advisory range. The career-offender guideline would have set Amado's offense level at 37 because his statutory maximum was life, but the district court's own calculation produced a higher offense level of 40. Under § 4B1.1(b), the greater offense level governs, and because the criminal history category was already set at VI, the career-offender designation did not alter the advisory range.

intelligence and family support had nonetheless not deterred him, and that a lengthy prison term was necessary to protect the public and ensure respect for the law.

"Generally, we review sentencing decisions for abuse of discretion." United States v. Ayala-Lugo, 996 F.3d 51, 55 (1st Cir. 2021). However, if a defendant fails to preserve an objection below, we review for plain error. See United States v. Rivera-Rivera, 146 F.4th 59, 85 (1st Cir. 2025). To prevail on plain-error review, the defendant must show "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the [defendant's] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Montero-Montero, 817 F.3d 35, 37 (1st Cir. 2016)).

### A. Obstruction-of-Justice Enhancement

The obstruction-of-justice enhancement applies "if a defendant exercises his right to testify at trial but commits perjury in the process." United States v. Cohen, 887 F.3d 77, 89 (1st Cir. 2018) (citing U.S.S.G. § 3C1.1 cmt. n.4). "A defendant commits perjury when he intentionally gives false testimony under oath on a matter material to the proceedings." United States v. Díaz, 670 F.3d 332, 351 (1st Cir. 2012).

Amado argues to us first that the record does not support a finding that he committed perjury and next that the district

court failed to make the findings required by United States v. Dunnigan, 507 U.S. 87 (1993). The first argument was made in his sentencing memorandum and so is reviewed for abuse of discretion. See United States v. Pinkham, 896 F.3d 133, 136 (1st Cir. 2018). The second argument was not raised below and is forfeited.

Contrary to Amado's trial testimony attempting to distance himself from the Audubon apartment and its contraband, the trial evidence showed that he visited the apartment almost every day, sometimes for hours, that his then-girlfriend leased the unit at his direction, and that weeks before she signed the lease he was researching drug-trafficking equipment that was later recovered from the Audubon apartment. On this record, the district court reasonably found Amado's denials false. His statements were also plainly material, as the Audubon apartment lay at the heart of the drug-trafficking conspiracy. And Amado's partial candor, such as admitting ownership of the drugs seized from the Jeep and the Ricciuti apartment, does not establish error in the finding that he intentionally gave false testimony on other issues. The district court did not abuse its discretion.

### B. Career-Offender Designation

Amado argues to us, but did not argue to the district court, that his 2017 and 2019 Massachusetts drug-trafficking convictions should have been treated as a single conviction because, he asserts, there was no "intervening arrest" between

them.  See U.S.S.G. § 4A1.2(a)(2).  At most, this argument receives plain-error review.  See United States v. Rivera-Morales, 961 F.3d 1, 12 (1st Cir. 2020).  And because Amado's appellate "brief fails to even mention plain error, let alone argue for its application," he has waived the claim.  United States v. Martínez-Mercado, 132 F.4th 61, 68-69 (1st Cir. 2025) (quoting United States v. Cruz-Ramos, 987 F.3d 27, 40 (1st Cir. 2021)).  Any error would in any event have been harmless, because as the district court noted, the career-offender designation did not affect Amado's advisory range.

### C.  Substantive Reasonableness

Finally, Amado contends that his 384-month sentence was substantively unreasonable because his co-defendant Kevin Cardoso received a much shorter, 188-month prison term.  In the district court, however, Amado's sentencing memorandum mentioned Cardoso's sentence only in passing, remarking that his own term was "more than twice Cardoso's sentence."  Amado never invoked 18 U.S.C. § 3553(a), explained why the obvious differences between himself and Cardoso did not matter, or pressed the argument at sentencing.  Nor did he argue plain error in his briefs to us, waiving the claim.  See id. at 68.  It is also unpersuasive.  "To establish a well-founded claim of sentencing disparity, a defendant must compare apples to apples."  United States v. Casillas-Montero, No. 23-1859, 2025 WL 2650602, at *14 (1st Cir. Sept. 16, 2025) (quoting United States v. Coplin-Benjamin, 79 F.4th 36, 43 (1st Cir. 2023)

(internal quotation marks omitted)). Cardoso had a lower Guidelines range and less significant criminal history, and he pleaded guilty under a binding plea before a different judge. These material differences defeat Amado's claim. See, e.g., United States v. Candelario-Ramos, 45 F.4th 521, 526 (1st Cir. 2022) (observing that two co-defendants were sentenced by a different judge, "a fact that makes [their] sentence[s] . . . less relevant" to a disparity claim (alterations in original) (quoting United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009))).

Amado's convictions and sentence are **affirmed**.